2004-NMCA-032

86 P.3d 1050

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Sean Gene DRUKTENIS, Defendant–
Appellant.**

**No. 22,437.**

Court of Appeals of New Mexico.

Jan. 30, 2004.

Patricia A. Madrid, Attorney General, Margaret McLean, Assistant Attorney General, John W. Wheeler II, New Mexico Department of Public Safety, Santa Fe, NM, for Appellee.

D. Penni Adrian, Adrian & Salazar, P.C., Albuquerque, NM, for Appellant.

John B. Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Amicus Curiae Appellate Public Defender.

## OPINION

SUTIN, Judge.

{1} Defendant Sean Gene Druktenis pled guilty in 1998 to sex offenses for which he was not required to register under New Mexico's then existing sex offender law. Because he was later required to register for those offenses as a result of the retroactive application of amendments to the law, *see generally* New Mexico's Sex Offender Registration and Notification Act (SORNA), NMSA 1978, §§ 29–11A–1 to –8 (1999, as amended through 2000), Defendant attacks the constitutionality of SORNA on several grounds. He also seeks specific performance of his plea agreement, asserting that the State agreed that he would not be required to register.

{2} We hold that SORNA does not violate either the federal or State Ex Post Facto Clause, does not violate either the federal or the State Due Process Clause, and does not violate Article IV, Section 34 of the New Mexico Constitution. We decline to address Defendant's unpreserved argument that application of SORNA violates the federal and State Contract Impairment Clauses. We hold that Defendant is not entitled to enforce his plea agreement in the manner he contends it should be enforced.

## BACKGROUND

{3} In October 1996, Defendant was indicted by a grand jury on thirty criminal counts. In October 1998, he entered into a plea and disposition agreement in which, pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), he pled guilty to four counts of battery, one count of kidnapping with intent to commit a sexual offense, and one count of attempted criminal sexual contact of a minor in the fourth degree. The district court sentenced Defendant to imprisonment for one year on the battery convictions, suspended that sentence, and ordered one year of supervised probation; and the court sentenced Defendant on the kidnapping and attempted criminal sexual contact convictions to imprisonment for nine years, suspended that sentence, and ordered five years of supervised probation.

{4} The battery offenses were petty misdemeanors, *see* NMSA 1978, § 30–3–4 (1963), each a lesser-included offense of a charge of criminal sexual penetration perpetrated through the use of force or coercion, and each of those charges involved a different victim. Kidnapping by force, intimidation, or deception, with the intent to commit a sexual offense, a second degree felony, was charged under NMSA 1978, § 30–4–1 (1995). The attempted criminal sexual contact of a minor, a misdemeanor, was a lesser-included offense of criminal sexual contact of a minor in the fourth degree, perpetrated with force or coercion, a fourth degree felony. *See* NMSA 1978, §§ 30–9–13(B) (2001), 30–28–1(D) (1963). The kidnapping and attempted criminal sexual contact charges related to the same victim, the fifth of Defendant's asserted victims.

{5} At the time of the offenses, the plea agreement, and the judgment, sentence, and order of probation, the New Mexico Sex Offender Registration Act (SORA), NMSA 1978, §§ 29–11A–1 to –8 (1995), was law. SORA did not require sex offender registration for the particular offenses to which Defendant pled guilty and was sentenced. *See* § 29–11A–3(B) (1995). Defendant purposely pled guilty only to crimes for which he was not required under SORA to register as a sex offender.

{6} SORA was amended twice after Defendant's plea agreement and sentence. Amendments in 1999 changed the title of the Act to the Sex Offender Registration and Notification Act (SORNA) and expanded the offenses for which a convicted sex offender was required to register to include, among others, the crime of attempted criminal sexual contact of a minor in the fourth degree to which Defendant had pled guilty in 1998. 1999 N.M. Laws ch. 19, §§ 3, 5; *see* §§ 29–11A–3(B)(9), –5(D)(5), –5(E)(7) (2000). Amendments in 2000 added kidnapping, also a crime to which Defendant had pled guilty. 2000 N.M. Laws ch. 8, §§ 1, 3; *see* § 29–11A–3(B)(6), –5(D)(4) (2000).

{7} The 1999 amendments did not, however, expressly apply retroactively to convictions occurring before its effective date. Under SORA, a sex offender was a person

"convicted of a sex offense on or after July 1, 1995." § 29–11A–3(A)(1) (1995). The 1999 amendments left that unchanged, making SORNA applicable "to persons convicted of a sex offense committed on or after July 1, 1999." 1999 N.M. Laws ch. 19, § 11 (repealed by 2000 N.M. Laws ch. 8, § 7). However, the 2000 amendments to SORNA were made applicable to "persons convicted of a sex offense on or after July 1, 1995," and to "persons convicted of a sex offense prior to July 1, 1995 and who, on July 1, 1995, were incarcerated, on probation or on parole." 2000 N.M. Laws ch. 8, § 9. The 2000 amendments became effective July 1, 2000. 2000 N.M. Laws ch. 8, § 10. Further, the 2000 amendments enacted a provision requiring law enforcement agencies to provide registration information to anyone requesting it. 2000 N.M. Laws ch. 8, § 4; *see* § 29–11A–5.1(C) (2000). The 2000 amendments added provisions requiring certain "active community notification" of registration information and permitting internet website dissemination of registration information. 2000 N.M. Laws ch. 8, § 4; *see* § 29–11A–5.1(D), (E) (2000). In short, the impact on Defendant of the 1999 and 2000 amendments was that the crimes of kidnapping and attempted criminal sexual contact of a minor in the fourth degree were added to the list of crimes requiring registration; the notification provisions were extended to the general public, as opposed to only law enforcement personnel; the crime of attempted criminal sexual contact of a minor in the fourth degree was added to the list of crimes triggering the public notification provisions; and all changes were made retroactive.

{8} Based on the 2000 amendments to SORNA, Defendant's probation officer informed him that he must register as a convicted sex offender. In response, in December 2000, Defendant filed a motion to have SORNA declared inapplicable to him or, in the alternative, to have himself declared exempt from its registration requirements. In his motion, Defendant attacked SORNA as an ex post facto law and asserted a due process deprivation on the ground he was not notified at the time of sentencing that he was required to register. Defendant also sought to withdraw his plea, were the court

to determine he was subject to SORNA. While Defendant's motion was pending before the district court, the State sought to revoke Defendant's probation for failing to register as a sex offender, failing to obey the directives of the probation officer to register, and committing a felony by not registering as required under SORNA. *See* § 29–11A–4(I) (2000).

{9} Defendant's plea agreement did not contain a reference to SORA or mention anything regarding Defendant's intent behind entering a plea. However, as a part of the post-conviction proceedings instituted by Defendant's motion, Defendant and the State stipulated that before he entered his pleas of guilty, Defendant retained an attorney to negotiate a plea agreement to offenses specifically chosen to exclude any offenses which could be considered "sex offenses" within the law as it was written at the time of the plea agreement. The stipulation further stated:

3. With an understanding of the provisions of the Sexual Offender Registration and Notification Act that were in effect in October of 1998, the parties agreed that the Defendant would not be required to register as a sex offender. The parties never discussed, and the Defendant was never advised, that the provisions of the Sex Offender Registration and Notification Act might someday in the future change, thereby potentially subjecting him to registration as a sex offender.

4. At the time Defendant pled guilty to the offenses contained in the Plea and Disposition Agreement, Defendant was advised by his attorney that he would not be required to register as a sex offender.

5. Defendant agreed to enter into the negotiated plea agreement based upon the above representations from his attorney.

{10} The district court denied Defendant's motion. Among other determinations, the court held that "SORA [did] not unduly disadvantage the defendant," that the "disadvantage or burden to the defendant emanate[d] from his plea of guilty," and that

SORA was not punitive and therefore not in violation of ex post facto laws. Further, the court rejected Defendant's asserted denial of due process by having to register without having been given proper notice, and Defendant's argument that Article II, Section 18 barred the application of SORNA. In regard to Defendant's argument that retroactive application violated the plea agreement, the court indicated that "[t]he registration provisions and public disclosure provisions of [SORA were] collateral consequences of [Defendant's] plea" and did not invalidate the plea agreement. Defendant filed a motion to reconsider, in which he did not renew his request to withdraw the plea. The court entered an order denying the motion to reconsider and incorporating its earlier findings contained in its order denying Defendant's initial motion to withdraw his plea. The court further found that Defendant was a sex offender within the meaning of SORNA, that he must register, and that "[t]he act of registering is a collateral consequence of defendant's original plea." Defendant appeals.

{11} On appeal, Defendant contends in his brief in chief that (1) subjecting him to registration as a sex offender under SORNA violates the Ex Post Facto Clause of the New Mexico and the United States Constitutions because, "[i]rrespective of its purpose, SOR[N]A has a predominantly punitive effect"; (2) his case was "pending" for the purposes of Article IV, Section 34 of the New Mexico Constitution which prohibits the Legislature from enacting legislation that "shall affect the right or remedy of either party, or change the rules of evidence or procedure, in any pending case"; and (3) application of SORNA violates Defendant's right to both substantive and procedural due process in that registration is required without an assessment that Defendant is a current danger to society or a recidivist and without affording Defendant an opportunity "to challenge the legislative assumptions and findings that he is dangerous and presents a threat of likely recidivism."

{12} Defendant's reply brief is devoted solely to his contention, not clearly raised, if raised at all, in his brief in chief or below,

that the SORNA requirements violate constitutional contract impairment prohibitions. *See* U.S. Const. art. I, § 10 ("No State shall ... pass any ... Law impairing the Obligation of Contracts."); N.M. Const. art. II, § 19 ("No ... law impairing the obligation of contracts shall be enacted by the legislature."). In the conclusion only of his brief in chief, Defendant asks this Court to "consider reversing" the district court's denial of his motion to withdraw his plea, but Defendant does not set out any point, authority, or argument in support of this request. In oral argument, Defendant expressly withdrew his plea withdrawal request.

{13} We held this appeal in abeyance and stayed Defendant's registration as a sex offender pending the disposition in the United States Supreme Court of two cases covering ex post facto and procedural due process issues. The Supreme Court recently handed down decisions in these two cases, *Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), and *Connecticut Dep't of Pub. Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) [hereinafter *Connecticut v. Doe*].

## DISCUSSION

### I. Standard of Review

{14} We review Defendant's constitutional challenges to SORNA under a de novo standard of review. *See State v. Laguna,* 1999–NMCA–152, ¶ 24, 128 N.M. 345, 992 P.2d 896; *see also Georgia O'Keefe Museum v. County of Santa Fe,* 2003–NMCA–003, ¶ 27, 133 N.M. 297, 62 P.3d 754 ("We interpret the Constitution and determine whether the law was properly applied to the facts through de novo review."); *cf. State v. Herbstman,* 1999–NMCA–014, ¶ 16, 126 N.M. 683, 974 P.2d 177 (stating, in a SORA-related case, that interpretation of the relevant statutes is a question of law, which this Court reviews de novo). We review Defendant's specific performance contention de novo, as well, since the facts are not disputed and the issue is purely a legal one. *See State v. Esparza,* 2003–NMCA–075, ¶ 13, 133 N.M. 772, 70 P.3d 762 ("Because the underlying facts ... are not in dispute, we review the legal issues presented de novo.").

{15} In regard to Ex Post Facto Clause and Article IV, Section 34 related constitutional attacks, there exists a presumption of constitutionality, and the party attacking the constitutionality of the statute has the burden of proving the statute is unconstitutional beyond all reasonable doubt. *See Espanola Hous. Auth. v. Atencio,* 90 N.M. 787, 788, 568 P.2d 1233, 1234 (1977); *see also State v. Clark,* 1999-NMSC-035, ¶ 62, 128 N.M. 119, 990 P.2d 793 (same, in a criminal prosecution involving Fourteenth Amendment guarantee); *City of Farmington v. Fawcett,* 114 N.M. 537, 540, 843 P.2d 839, 842 (1992) (same, in a criminal prosecution); *City of Raton v. Sproule,* 78 N.M. 138, 142, 429 P.2d 336, 340 (1967) (stating that assertions of Fourteenth Amendment due process and equal protection grounds in attacking a statute's classification limiting electors to residents of a county are to be examined under a presumption of the validity and regularity requiring the court to refrain from declaring the statute unconstitutional "unless the court is satisfied beyond all reasonable doubt that the legislature went outside the constitution in enacting the challenged legislation"). This presumption is a "strong" presumption. *City of Albuquerque v. One (1) 1984 White Chevy,* 2002-NMSC-014, ¶ 5, 132 N.M. 187, 46 P.3d 94.

{16} In regard to Fourteenth Amendment liberty interest claims, we look to standards of strict, intermediate, or rational basis scrutiny, to analyze the constitutionality of the statute. *See Trujillo v. City of Albuquerque,* 1998-NMSC-031, ¶ 14, 125 N.M. 721, 965 P.2d 305 [hereinafter *Trujillo III*]; *Marrujo v. N.M. State Highway Transp. Dep't,* 118 N.M. 753, 757, 887 P.2d 747, 751 (1994). Under rational basis scrutiny, the party attacking the constitutionality of the statute must overcome a presumption of constitutionality under a burden similar to the burden generally imposed as set out in *Espanola Housing Authority,* 90 N.M. at 788, 568 P.2d at 1234, and the long list of cases following it. "To successfully challenge a statute under the rational basis test, a plaintiff is required to show that the statute's classification is not rationally related to the legislative goal." *Trujillo III,* 1998-NMSC-031, ¶ 14, 125 N.M. 721, 965 P.2d 305 (citing *Richardson v. Carnegie Library Rest., Inc.,* 107 N.M. 688, 694, 763 P.2d 1153, 1159 (1988)). "[L]egislative acts are presumptively valid and normally are subjected to the rational basis test." *Richardson,* 107 N.M. at 693, 763 P.2d at 1158, *overruled on other grounds by Trujillo III,* 1998-NMSC-031, 125 N.M. 721, 965 P.2d 305. However, once the party attacking the constitutionality of the statute has shown an interest at stake that is important enough to overcome the hurdle of rational basis review, requiring invocation of either strict or intermediate scrutiny, the State then bears the burden of proof. *See id.* ¶¶ 15-16.

## II. SORNA

{17} SORA was enacted on July 1, 1995. 1995 N.M. Laws ch. 106, § 1; *see* § 29-11A-1 (1995). It was enacted in the wake of the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C.A. § 14071 [hereinafter Megan's Law]. *See State v. Bollig,* 232 Wis.2d 561, 605 N.W.2d 199, 204 (2000) (discussing the history of sex offender registration laws and noting the "statutes in most states are remarkably similar" because the statutes "have the same genesis and are versions of Megan's Law"). It has been recognized that "all fifty states have enacted sex offender registration laws of varying degrees." *State v. Cook,* 83 Ohio St.3d 404, 700 N.E.2d 570, 574 (1998).

{18} The legislative findings for the passage of SORA, untouched in amendments, are found in SORNA's Section 29-11A-2(A) (1999):

> A. The legislature finds that:
>
> (1) sex offenders pose a significant risk of recidivism; and
>
> (2) the efforts of law enforcement agencies to protect their communities from sex offenders are impaired by the lack of information available concerning convicted sex offenders who live within the agencies' jurisdictions.

{19} SORNA is part of New Mexico's Law Enforcement Code and not part of the Criminal Code. The express purpose of SORNA is to assist law enforcement to protect commu-

nities by requiring resident sex offenders "to register with the county sheriff," "requiring the establishment of a central registry for sex offenders," and "providing public access to information regarding certain registered sex offenders." § 29–11A–2(B)(1), (3), (4) (1999).

{20} Section 29–11A–3 contains definitions of certain terms. A "sex offender" is defined in several ways; as applicable to Defendant, a " 'sex offender' means a person eighteen years of age or older who ... is a resident of New Mexico who is convicted of a sex offense in New Mexico." § 29–11A–3(A)(1) (2000). "[S]ex offense" includes "kidnapping ... when the victim is less than eighteen years of age and the offender is not a parent of the victim." § 29–11A–3(B)(6) (2000). "[S]ex offense" also includes an attempt to commit criminal sexual contact of a minor in the fourth degree under Sections 30–9–13, 30–28–3, and 30–28–1. § 29–11A–3(B)(8), (9) (2000).

{21} These definitional sections bring Defendant squarely within SORNA's registration provisions. Defendant is required to register with the county sheriff of the county in which he lives. § 29–11A–4(A) (2000). Registration includes providing his name, date of birth, social security number, current address, place of employment, sex offense for which convicted, and date and place of conviction. § 29–11A–4(B) (2000). The sheriff is required to obtain a photograph, distinguishing features, and fingerprints of Defendant. § 29–11A–4(E) (2000). Imposed on Defendant is a continuing duty to notify the sheriff of any change of address if the new residence is in the same county; and if he moves to another county, he is required to notify both that sheriff and the sheriff with whom he last registered. § 29–11A–4(F), (G) (2000). The county sheriff is to maintain a local registry of sex offenders and to forward the registration information to the State Department of Public Safety (the Department). § 29–11A–5(A), (B) (2000). The Department is required to maintain a central registry of sex offenders and to participate in the national sex offender registry administered by the United States Department of Justice. § 29–11A–5(C) (2000).

{22} The definitional sections also bring Defendant squarely within SORNA's notification provisions. If a sex offender is convicted of the crime of kidnapping as it is listed in SORNA, as was Defendant, or other crimes listed in Subsection 29–11A–5(D), the Department must retain the registration information "for a period of twenty years following ... conviction, release from prison or release from probation or parole, whichever occurs later." § 29–11A–5(D) (2000). For other crimes, including attempted sexual contact of a minor in the fourth degree, the period to retain the registration information is ten years. § 29–11A–5(E) (2000). A sex offender must renew his registration annually for the applicable time period. § 29–11A–4(H) (2000). A sex offender willfully failing to comply with the registration requirements is guilty of a fourth degree felony. § 29–11A–4(I) (2000).

{23} Certain sex offenders are subject to SORNA's public access to information, active community notification, and internet website provisions, which we refer to in this opinion as "notification provisions." *See* § 29–11A–5.1 (2000). The notification provisions are triggered by a conviction of specific sex offenses. § 29–11A–5.1(A) (2000). The crimes that trigger the notification provisions are criminal sexual penetration in the first or second degree under NMSA 1978, § 30–9–11 (2001); criminal sexual contact of a minor in the third or fourth degree under Section 30–9–13; sexual exploitation of children under NMSA 1978, § 30–6A–3(A), (B), (C) (2001); sexual exploitation of children by prostitution under NMSA 1978, § 30–6A–4 (1989); and an attempt to commit any of these enumerated crimes. § 29–11A–5.1(A) (2000).

{24} Under the notification provisions, the registration information of those convicted of these specific crimes is required to be made available by the sheriff, the district attorney, or chief municipal law enforcement officer, or the secretary of the Department, to any "person who wants to obtain registration information." § 29–11A–5.1(B) (2000). Further, "with the exception of the sex offender's social security number," the registration information must be provided to "every licensed daycare center, elementary school,

middle school and high school within a one-mile radius of the sex offender's residence." § 29–11A–5.1(D) (2000). In addition, the Department is authorized to provide information to the public through an internet website. § 29–11A–5.1(E) (2000). The limitations on website publication are that the information published "shall not include a sex offender's social security number or a sex offender's place of employment, unless the sex offender's employment requires him to have direct contact with children." *Id.* In oral argument, the State informed this Court that the Department does indeed maintain a website, that it receives thousands of hits, and that it contains the location of a sex offender's place of employment, whether a school, restaurant, or retail merchandise outlet.

{25} Defendant includes both the registration and notification provisions in his argument that SORNA violates the Ex Post Facto Clause of the State and federal Constitutions on the ground that SORNA is punitive in purpose and effect. He discusses the registration requirement in pursuing his Article IV, Section 34 argument. In his substantive and procedural due process arguments, Defendant dwells on the notification provisions of SORNA in arguing that his constitutional liberty right, defined through privacy and reputation interests, has been violated.

### III. The Ex Post Facto Claim

{26} Defendant contends that SORNA's retroactive application violates the constitutional prohibitions against ex post facto laws contained in Article II, Section 19 of the New Mexico Constitution and Article I, Section 10 of the United States Constitution. "The Latin phrase 'ex post facto' implicates in its literal meaning any law passed 'after the fact.' Generally, this means 'that the constitutional prohibition ... applies only to penal statutes which disadvantage the offender affected by them.'" *State v. Nunez,* 2000–NMSC–013, ¶ 112, 129 N.M. 63, 2 P.3d 264 (quoting *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)).

{27} We note, in passing, that the issue of whether retroactive application of sex offend-er registration and notification requirements violates the federal Ex Post Facto Clause has been considered by many jurisdictions. *See generally* Carol Schultz Vento, Annotation, *Validity, Construction, and Application of State Statutes Authorizing Community Notification of Release of Convicted Sex Offender,* 78 A.L.R.5th 489 (2000); Licia A. Esposito, Annotation, *State Statutes or Ordinances Requiring Persons Previously Convicted of Crime to Register with Authorities,* 36 A.L.R.5th 161 (1996), *superseded by* Vento, *supra.*

{28} In *Smith v. Doe,* the United States Supreme Court addressed the issue of whether Alaska's version of Megan's Law violated the Ex Post Facto Clause of the United States Constitution. 123 S.Ct. at 1145–46. Alaska's law applied its registration and notification components retroactively. *Id.* at 1145. The law required sex offenders to provide certain information through registration with the department of corrections or local law enforcement officials and to continue to regularly provide verification of that information for a period of either fifteen years for a single, non-aggravated offense, or life for an aggravated offense. *Id.* at 1145–46. Specifically, the Alaska statute required the sex offender to "provide his name, aliases, identifying features, address, place of employment, date of birth, conviction information, driver's license number, information about vehicles to which he has access, and postconviction treatment history." *Id.* The information was given to the Alaska department of public safety and placed in a central registry, and the sex offender's name, aliases, address, photograph, physical description, motor vehicle information, place of employment, date of birth, crime, and sentence, were thereby available to the public. *Id.* at 1146. Alaska made most of this information available on the Internet. *Id.*

{29} The Court analyzed whether the Alaska sex offender law was "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* at 1147 (alteration in original) (internal quotation marks and citation omitted). Then, using as a framework several of the factors enumerated in *Kennedy v. Mendoza–Mar-*

*tinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), factors that are "neither exhaustive nor dispositive," the Court set out a detailed analysis of the purpose and effect of the Alaska law. *Smith v. Doe,* 123 S.Ct. at 1149–54 (internal quotation marks and citation omitted). Particularly, the Court considered "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* at 1149. The Court concluded that "the intent of the Alaska Legislature was to create a civil, nonpunitive regime," *id.,* and that the defendants were unable to show "that the effects of the law negate[d] Alaska's intention to establish a civil regulatory scheme." *Id.* at 1154. Accordingly, the Court determined that the retroactive application of Alaska's sex offender law did not violate the Ex Post Facto Clause. *Id.*

{30} In another context, our New Mexico Supreme Court referred to the *Mendoza–Martinez* framework as "the test" in determining whether a statute is intended as punitive rather than remedial. *See One (1) 1984 White Chevy,* 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94 (citing *Hudson v. United States,* 522 U.S. 93, 99–100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), as "describing the test for determining whether a statutory scheme created a civil remedy or criminal penalty"). We applied the *Mendoza–Martinez* framework in *State v. Kirby,* 2003–NMCA–074, ¶¶ 27–39, 133 N.M. 782, 70 P.3d 772, *cert. denied,* 133 N.M. 771, 70 P.3d 761, to analyze the double jeopardy effect of a civil penalty in New Mexico's Securities Act.

{31} The specific *Mendoza–Martinez* factors are:

1) whether the sanction involves an affirmative disability or restraint;

2) whether it has historically been regarded as a punishment;

3) whether it comes into play only on a finding of scienter;

4) whether its operation will promote the traditional aims of punishment—retribution and deterrence;

5) whether the behavior to which it applies is already a crime;

6) whether an alternative purpose to which it may rationally be connected is assignable to it; and

7) whether it appears excessive in relation to the alternative purpose assigned.

*Doe I v. Otte,* 259 F.3d 979, 986–87 (9th Cir.2001) (quoting *Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. 554), *rev'd on other grounds by Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164. Many other courts have employed the *Mendoza–Martinez* factors. *See, e.g., Femedeer v. Haun,* 227 F.3d 1244, 1249–53 (10th Cir.2000); *State v. Noble,* 171 Ariz. 171, 829 P.2d 1217, 1221–24 (1992) (en banc); *State v. Mount,* 317 Mont. 481, 78 P.3d 829, 836–41 (2003); *State v. Ward,* 123 Wash.2d 488, 869 P.2d 1062, 1068–74 (1994) (en banc). *But see Artway v. Attorney Gen. of N.J.,* 81 F.3d 1235, 1261–67 (3d Cir.1996) (preferring not to apply *Mendoza–Martinez* factors, but to apply a three-pronged test of (1) actual purpose, (2) objective purpose, and (3) "whether the effects ... or 'sting' ... of a measure is so harsh 'as a matter of degree' that it constitutes 'punishment' "); *E.B. v. Verniero,* 119 F.3d 1077, 1093–1105 (3d Cir.1997) (elaborating on the *Artway* three-pronged analysis).

{32} We have no doubt that our Legislature's intent in enacting SORNA was to enact a civil, remedial, regulatory, nonpunitive law. In regard to whether the effects of the law negated that intent, looking at the *Mendoza–Martinez* factors, these conclusions are obvious: the provisions of SORNA do not involve affirmative disability or restraint; have not historically been regarded as punishment; do not come into play only on a finding of scienter; only incidentally, if at all, promote traditional aims of retribution and deterrence; and have a rationally connected, nonpunitive purpose. In our view, that SORNA applies only to behavior that is already criminal is not a significant factor. Still, common sense tells us that the combination of registration and notification can have harsh consequences on sex offenders. Thus, the remaining question under *Mendoza–Martinez* is whether SORNA's combination

of registration and notification provisions are excessive as they relate to its public safety purpose. *See Smith v. Doe*, 123 S.Ct. at 1149, 1152–53.

{33} Various courts have recognized that a sex offender can suffer adverse consequences, including employability problems, harassment, stigma ostracism, humiliation, and physical harm, as a result of notification provisions. For example, the Third Circuit Court of Appeals has recognized that:

> registrants and their families have experienced profound humiliation and isolation as a result of the reaction of those notified. Employment and employment opportunities have been jeopardized or lost. Housing and housing opportunities have suffered a similar fate. Family and other personal relationships have been destroyed or severely strained. Retribution has been visited by private, unlawful violence and threats and, while such incidents of "vigilante justice" are not common, they happen with sufficient frequency and publicity that registrants justifiably live in fear of them.

*Verniero*, 119 F.3d at 1102; *see also Russell v. Gregoire*, 124 F.3d 1079, 1092 (9th Cir. 1997) (stating that "[n]otification may well subject offenders to humiliation, public opprobrium, ostracism, and the loss of job opportunities," and, in holding the law to be remedial, stating that the law "may have a lasting and painful impact on a sex offender's life, which ought not be lightly disregarded"); *Doe v. Pataki*, 3 F.Supp.2d 456, 467–69 (S.D.N.Y.1998) ("As the experiences of convicted sex offenders subject to similar requirements in other jurisdictions has [sic] shown, such widespread dissemination of the above information is likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences. Thus, there is no genuine dispute that the dissemination of the information contemplated by the Act to the community at large is potentially harmful to plaintiffs' personal reputations. . . . Not only will registration and notification likely affect every aspect of the offender's life, according to the terms of the Act they will do so for a minimum of ten years." (citations omitted)); *Opinion of the Justices to the Senate*, 423 Mass. 1201, 668 N.E.2d 738, 752 (1996) (noting that "courts and commentators . . . have pointed out the severe consequences that community notification may have and have in fact had for released sex offenders," and stating "[t]hat such consequences constitute a burden or detriment to the offender can hardly be doubted"); *Cook*, 700 N.E.2d at 579 ("This court is not blind to the effects of the notification provisions of [the statute]. Offenders may become ostracized from society and even experience harassment."); *Noble v. Bd. of Parole & Post–Prison Supervision*, 327 Or. 485, 964 P.2d 990, 995–96 (1998) (recognizing that, from notification, an offender could face "social ostracism, loss of employment opportunities, and significant likelihood of verbal and, perhaps, even physical harassment"). In *Smith v. Doe*, even the United States Supreme Court recognized that "[t]he publicity may cause adverse consequences . . . running from mild personal embarrassment to social ostracism," with attendant "humiliation increasing in proportion to the extent of the publicity." 123 S.Ct. at 1150.

{34} Nevertheless, although the notification provisions are likely to have varying types and degrees of adverse consequences for an offender, we conclude that they are not excessive in relation to the public safety purpose of SORNA. *Accord Bollig*, 605 N.W.2d at 205–06 ("Although we recognize that sex offenders have suffered adverse consequences, including vandalism, loss of employment, and community harassment, the punitive or deterrent effects resulting from registration and the subsequent dissemination of information do not obviate the remedial and protective intent underlying those requirements."). The purpose and the principal effect of notification are to inform the public for its own safety, not to punish or stigmatize and ostracize the offender. *See Smith v. Doe*, 123 S.Ct. at 1150 (stating that the stigma is not based on such conduct as colonial infliction of public disgrace, but "from the dissemination of accurate information about a criminal record, most of which is already public," and that "[o]ur system does not treat dissemination of truthful informa-

tion in furtherance of a legitimate governmental objective as punishment"). "Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." *Id.*[1]

{35} The United States Supreme Court held that "[t]he Ex Post Facto Clause does not preclude a [s]tate from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Smith v. Doe,* 123 S.Ct. at 1153. We agree with much of the underlying reasoning in *Smith v. Doe* and we think the holding is applicable to Defendant's ex post facto attack upon SORNA. Our Legislature's "regulatory means chosen [to address the problem] are reasonable in light of the nonpunitive objective." *Id.* at 1154.

{36} Virtually all federal circuits and state jurisdictions considering this issue have rejected the argument that retroactive application of sex offender statute registration and notification requirements violates constitutional ex post facto prohibitions. *See, e.g., Russell,* 124 F.3d at 1089 (stating, in ex post facto context, that "registration provisions have overwhelmingly been sustained as constitutional by other courts" and citing cases); *Hyatt v. Commonwealth,* 72 S.W.3d 566, 571–72 (Ky.2002) (stating that registration and notification requirements "across the nation have consistently been held to be remedial measures, not punitive," and that "[m]ost state and federal courts have determined that sex offender classification and registration, including community notification, does not violate the ex post facto provisions of either the state or federal constitution"); *Meadows v. Bd. of Parole & Post–Prison Supervision,* 181 Or.App. 565, 47 P.3d 506, 510 n. 11 (2002) (stating that "[t]he federal circuits appear to be . . . nearly unanimous in upholding sex offender registration laws against *ex post facto* challenges"); *Bollig,* 605

N.W.2d at 203 (stating that "[o]f the states that have addressed whether registration of sex offenders is punishment, all but one have answered in the negative," listing cases from twenty-one states in a footnote).

{37} For the foregoing reasons, and because Defendant has not overcome the presumption of constitutionality on this issue, we hold that retroactive application of SORNA does not violate the Ex Post Facto Clause of the United States Constitution. *See Cook,* 700 N.E.2d at 576 (stating that the presumption of constitutionality in an attack on a law as violating the Ex Post Facto Clause requires a showing "beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible," and "[t]hat presumption of validity of such legislative enactment cannot be overcome unless . . . a clear conflict" exists (internal quotation marks and citations omitted)). In our view, the seeming unfairness of retroactive application is lessened by the "irresistible conclusion that if community safety was [a legislature's] objective, there was no justification for applying these laws only to those who offend or who are convicted in the future, and not applying them to previously-convicted offenders." *Id.* at 578.

{38} Furthermore, we see no basis, and Defendant offers none, on which to grant greater protection under Article II, Section 19, our State Constitution's ex post facto provision. We cannot say that the federal analyses are flawed, that structural differences between the federal and our Constitution exist, or that there exist distinctive State characteristics, to lead us to a conclusion that we should interpret our Ex Post Facto Clause differently than the federal clause. *See State v. Gomez,* 1997–NMSC–006, ¶¶ 19–20, 122 N.M. 777, 932 P.2d 1 (adopting an "interstitial approach" to determine whether a state court may diverge from federal precedent when a constitutional issue is raised

---

1. It is important to note that the information disseminated is, for the most part, already public. *See* NMSA 1978, § 29–10–7(A)(2), (3), (B) (1993) (allowing public inspection of certain criminal records); 1978 N.M. Att'y Gen. Op. No. 78–9 (stating what may be included in a police blotter or original record of entry by law enforcement agencies); *see also* NMSA 1978, § 14–2–

1(A) (1999) (permitting public inspection of certain State public records); *State ex rel. Newsome v. Alarid,* 90 N.M. 790, 797, 568 P.2d 1236, 1243 (1977) (stating that every "citizen has a fundamental right to have access to public records," and that this right is limited only by "contrary statute or countervailing public policy").

under both federal and State Constitutions). Defendant sets out no argument for a more favorable interpretation. *See id.* ¶ 23 (requiring that the party seeking relief under the State Constitution provide reasons for interpreting the State provision differently from the federal provision when there is no established precedent). Accordingly, we hold that retroactive application of SORNA does not violate the New Mexico Constitution's Ex Post Facto Clause.

### IV. The Article IV, Section 34 Claim

■■■ {39} Defendant contends that his case was "pending" for the purposes of Article IV, Section 34 of the New Mexico Constitution, which states that "[n]o act of the legislature shall affect the right or remedy of either party, or change the rules of evidence or procedure, in any pending case." N.M. Const. art. IV, § 34. "It is the general rule that a case is not pending before it is on the docket of some court or after a final judgment is filed." *State v. Maynes,* 2001–NMCA–022, ¶ 7, 130 N.M. 452, 25 P.3d 902 (internal quotation marks and citation omitted).

{40} Defendant argues that his probation status subjected him to the continuing jurisdiction of the district court and his case therefore remained pending until his criminal liability was discharged, at which time the court would lose jurisdiction. *See State v. Padilla,* 106 N.M. 420, 422, 744 P.2d 548, 550 (Ct.App.1987) (stating that a sentencing court retains jurisdiction to revoke probation and suspend sentence prior to expiration of the sentence). Thus, Defendant contends, the court was barred from sanctioning him based on violations brought on by a change in legislation.

{41} More particularly, Defendant asserts that SORNA's inclusion of new offenses requiring registration resulted in the State's seeking revocation of his probation for failing to obey the probation officer's registration directive and for committing a fourth degree felony of failing to register after being told to do so. Thus, according to Defendant, his probation status, which was one not requiring registration at the time of his plea and placement on probation, was changed

through no act on his part, but rather solely through the SORNA amendments. He argues, therefore, that the amendments changed rules of procedure and evidence as to his probation status, in that "his probation officer ordered him to register as a condition of his continuing probation," and his new status as an offender required to register became evidence of an element of a charged probation violation, since, "[w]hen he did not register, not only did he allegedly violate probation, but his status as an offender under the 2000 amendments to SORA became evidence establishing an element of the fourth degree felony of not registering."

{42} In response, the State argues that Defendant's arguments fail for two reasons. First, Defendant's case was not pending because he did not appeal his conviction. Second, Defendant's probation was in fact revoked on grounds other than a failure to register. We agree with the State.

{43} Defendant did not appeal his judgment of conviction and sentence. Consequently, Defendant's criminal liability was not pending for the purpose of Article IV, Section 34, as there had been a judgment of conviction and an exhaustion of his right to appeal that conviction, not only by virtue of his plea of guilty but also by the passage of the deadline to appeal. *See State v. Rogers,* 93 N.M. 519, 521, 602 P.2d 616, 618 (1979) ("Cases are finalized only when there has been a judgment of conviction, sentence and exhaustion of rights of appeal." (internal quotation marks, citation, and emphasis omitted)). Defendant's guilt was locked in by the finality of his conviction and sentence. What remained subject to change was his probation status. A constitutionally permissible *retroactive application of SORNA requirements* to Defendant made him subject to a probation violation if he knowingly failed to register and if he were found to have committed a felony by failing to register. We do not consider this to constitute a legislative act that changes rules of evidence or procedure in a pending case. We think the legislative changes here are too indirect, remote, and attenuated to be considered unconstitutional under Article IV, Section 34.

{44} Furthermore, we note that although the State sought revocation of Defendant's probation based on his failure to register after the passage of the SORNA amendments, his probation was not revoked on that basis. While Defendant implies in his brief in chief that his probation was revoked for failing to register, the State asserts in its answer brief that Defendant's probation was revoked for other reasons, and Defendant does not dispute this assertion in his reply brief. Moreover, Defendant's duty to register was stayed pending this appeal. Defendant requested only a limited record on appeal. The limited record before us does not show the grounds on which the district court revoked Defendant's probation. It is Defendant's obligation to provide this Court with a sufficient record proper. *State v. Jim*, 107 N.M. 779, 780, 765 P.2d 195, 196 (Ct.App.1988). Because the record is inadequate, and because Defendant does not dispute the State's position, we proceed under the assumption that Defendant's probation was revoked on grounds other than failure to register. Working under this assumption, the new registration requirement did not change Defendant's probation status. Thus, even were Article IV, Section 34 arguably to apply to legislation indirectly affecting a convicted defendant's probation status, Article IV, Section 34 would be inapplicable in the present case because Defendant's probation status, although threatened by State action due to Defendant's failure to register, in fact was not affected by the SORNA amendments or by any State action to enforce the new registration requirements.

## V. The Substantive and Procedural Due Process Claims

{45} Defendant asserts violations of substantive and procedural due process because he was required to register without any distinction having been made between him and other sex offenders on the basis of recidivist propensities, and without being afforded any opportunity to challenge "the legislative assumptions and findings that he is dangerous and presents a threat of likely recidivism." SORNA's registration requirements do not, by themselves, make registration information available to the public or provide for public dissemination of the information. Defendant's attack focuses on the SORNA notification provisions. Defendant argues that he has a protected liberty interest based on underlying privacy and reputation interests and that he must be afforded a hearing on recidivist propensities prior to having to comply with SORNA's registration requirement. Another aspect of Defendant's contention is that, because SORNA may potentially subject him to a felony prosecution and probation violation should he fail to comply with its registration provisions, a hearing that would determine his risk of recidivism is necessary for due process protection.

{46} The Due Process Clause protects individuals against violations of both substantive and procedural due process. *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Defendant's claims require several complex constitutional analyses—(1) analyses that are not readily apparent to those who have not adequately studied Fourteenth Amendment constitutional guarantees when, as in this case, a statutory over-classification is at issue, and privacy and reputation interests are involved; and (2) analyses of methods of constitutional scrutiny courts are to consider in determining a statute's constitutionality under the Due Process and Equal Protection Clauses.

### A. Due Process and Equal Protection

#### 1. Procedural Due Process

{47} To establish a claim under the procedural aspect of the Due Process Clause, the claimant must show that a liberty interest exists that has been interfered with by a state. *See Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Identification of "the contours of the substantive right [is] a task distinct from deciding what procedural protections are necessary to protect that right." *Garcia v. Las Vegas Med. Ctr.*, 112 N.M. 441, 444, 816 P.2d 510, 513 (Ct.App. 1991) (internal quotation marks and citation omitted). If a restricted substantive right exists, we analyze whether there exist ade-

quate procedures to assure that all the process that is constitutionally due has been provided before the final deprivation of a protected interest through State action. *Thompson*, 490 U.S. at 460, 109 S.Ct. 1904; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (clarifying that the substantive right of liberty cannot be deprived except pursuant to constitutionally adequate procedures and that, once it is determined that the substantive right exists and "that the Due Process Clause applies, the question remains what process is due" (internal quotation marks and citation omitted)). The court under procedural due process must engage in a balancing and weighing of private and government interests, including concerns about "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). However, and in particular relation to the present case based on *Connecticut v. Doe*, the procedural due process constitutional analysis may cease at the stage of the substantive right inquiry if the person claiming its restriction cannot show the rule of law is defective.

{48} Indeed, Defendant's procedural due process claim in the present case is not viable. The claim is foreclosed under the controlling rationale in *Connecticut v. Doe*. The sex offender statute in *Connecticut v. Doe* contained registration and notification provisions triggered solely by the conviction of a sex offender. 123 S.Ct. at 1163–64. The United States Supreme Court stated that "[u]nless [the defendant] can show that that *substantive* rule of law is defective ..., any hearing on current dangerousness is a bootless exercise." *Id.* at 1164. The Court determined that because the registration and notification provisions were imposed based solely on conviction and not on the defendant's dangerousness, the question of the

defendant's dangerousness was not material and thus not a relevant inquiry. *Id.* As a result, the defendant's attack on the classification at issue, the Court held, "must ultimately be analyzed in terms of substantive, not procedural, due process." *Id.* at 1165 (internal quotation marks and citation omitted); *see also Michael H. v. Gerald D.*, 491 U.S. 110, 120–21, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (explaining that the illegitimacy of certain legislative irrebuttable presumptions did not rest on procedural due process, but rather on "the adequacy of the 'fit' between the classification and the policy that the classification serves," in rejecting the assertion of a procedural due process claim by a putative father to establish his paternity and proceeding with his substantive due process claim); *Black v. Snow*, 272 F.Supp.2d 21, 30–31 (D.D.C.2003) (mem.) (holding, with respect to statute barring felons from possessing firearms based on irrebuttable presumption, that constitutionality of statute would be determined under a substantive due process, rational basis scrutiny standard and not under a procedural due process analysis); *In re D.R.*, 342 Ill.App.3d 512, 276 Ill.Dec. 638, 794 N.E.2d 888, 892 (2003) (holding that, because notification law was based on conviction and not on dangerousness, procedural due process did not entitle a sex offender to an individualized hearing); *Ex Parte Mercado*, 2003 WL 1738452, *4 n. 11 (Tex.App.2003) (unpublished) (stating that the Texas sex offender law was "more amenable to a *substantive* due process review than a *procedural* one"); *State v. Radke*, 256 Wis.2d 448, 647 N.W.2d 873, 877 (Wis.Ct.App.2002) ("[S]ubstantive due process bars, among other things, certain arbitrary government actions, regardless of the fairness of the procedures used to implement them." (citing *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992))).[2]

{49} Judge Bustamante's special concurrence expresses a concern about what it con-

---

**2.** Ronald D. Rotunda and John E. Nowak note the difficulty and confusion that exist in separating procedural from substantive issues. *See* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.3 n. 42 (3d ed.1999). For a helpful example of the difference between substantive

and procedural due process, see § 14.6, at 530. The treatise further concludes that the difficulty in knowing the extent to which the United States Supreme Court will identify a right as fundamental "is exacerbated by those cases in which the Supreme Court mixes procedural and substantive due process questions." *Id.* § 15.7 n. 33.

siders to be an inconsistency between *Connecticut v. Doe*'s approach and the approach quoted from *Thompson*, 490 U.S. at 460, 109 S.Ct. 1904. His concurrence also suggests that *Connecticut v. Doe*'s approach places into question the continuing vitality of *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). We do not see a basis for concern. The rule in *Thompson* is that applied in procedural due process, not substantive due process. *Roth* and *Jenkins* were procedural due process cases. *Connecticut v. Doe* rejected procedural due process and thus never got to the rule or approach set out in *Thompson*. In *Connecticut v. Doe*, as in the present case, there in fact existed a right that was restricted and that could call for a procedural due process analysis *if* Defendant claimed that he was entitled to a hearing on *whether he was convicted* or whether his *conviction* was one that triggered the registration and notification provisions of SORNA. However, that was not the issue in *Connecticut v. Doe* and it is not the issue in the present case. The issue Defendant raises does not concern his conviction, but rather his dangerousness, an element that is not material as to whether, as a constitutional matter under SORNA, the registration and notification provisions entitle Defendant to a hearing. *Connecticut v. Doe* plainly holds that a sex offender statute that requires registration and notification based solely on conviction is not substantively defective in regard to a defendant complaining about lack of a procedure to determine dangerousness. With procedural due process eliminated from consideration, the tests for examining procedural process, such as that stated in *Thompson*, are not applicable. The question for determination is that of substantive due process.

## 2. Substantive Due Process

{50} Defendant claims that he has a Due Process Clause liberty interest that was impermissibly restricted and that is protected under substantive due process. He contends that SORNA's constitutional viability under substantive due process depends on the provision for an individualized risk-as-sessment hearing as to recidivist proclivity before effectuation of the notification provisions.

{51} Defendant's asserted federally protected constitutional liberty interest stems from the federal Due Process Clause, which states in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Our State counterpart reads in part: "No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws." N.M. Const. art. II, § 18.

> Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," or are "implicit in the concept of ordered liberty."

*Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (citations omitted), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643, 666, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Black, J., concurring); *see also State v. Rotherham*, 122 N.M. 246, 259, 923 P.2d 1131, 1144 (1996) (stating, in regard to attack on duration of commitment allowed by statute, "substantive due process prevents the government from engaging in conduct that ... interferes with rights implicit in the concept of ordered liberty." (alteration in original) (internal quotation marks and citation omitted)).

{52} In examining the constitutionality of a statute for substantive due process, we determine, as a threshold matter, the nature of the private interest at stake. That is, we first analyze whether it is a fundamental right or involves a suspect class, or involves an important right held by a sensitive class. The determination made leads us to an examination of (1) whether the government must prove a compelling and legitimate government interest (strict scrutiny), (2) whether the government must prove a substantial government interest (intermediate scrutiny), or (3) whether the party attacking the consti-

tutionality of the statute must prove lack of a rational basis for the statute. *See Marrujo v. N.M. State Highway Transp. Dep't*, 118 N.M. 753, 757, 887 P.2d 747, 751 (1994).

### 3. Substantive Due Process and Equal Protection

{53} Defendant's substantive due process attack implicitly and necessarily includes an equal protection attack. *See* U.S. Const. amend. XIV, § 1 ("[N]or deny to any person within its jurisdiction the equal protection of the laws."); N.M. Const. art. II, § 18 ("[N]or shall any person be denied equal protection of the laws."). Defendant's theory is basically that SORNA creates an improper classification by failing to classify. That is, the statute creates an arguably over-inclusive classification, *see* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.2, at 211–12, by failing to "distinguish between persons who, for equal protection purposes, should be regarded as differently situated." Laurence H. Tribe, *American Constitutional Law* § 16–1, at 1438 (2d ed.1988). "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *see* Tribe, *supra*, § 16–2, at 1438–39; *Raines v. State*, 805 So.2d 999, 1003 (Fla. Dist.Ct.App.2001) (holding unconstitutional, under the Equal Protection Clause as being over-inclusive, a statute that defined a sex offender as a person convicted of false imprisonment that had no "concomitant sexual component").

{54} The issue here brings substantive due process and equal protection principles and analyses together. *See In re Joseph E.G.*, 240 Wis.2d 481, 623 N.W.2d 137, 142 (Wis.Ct. App.2000) (stating in sex offender case that the same analysis was applicable to both equal protection and substantive due process claims). SORNA establishes an irrebuttable presumption that all persons convicted of the notification-triggering sex offenses pose a significant risk of recidivism, thereby classifying those people for the burden of notification, without providing for an individualized hearing to determine the individual merit of an offender's claim not to be a recidivist. "[C]onstruction of the fourteenth amendment as a guarantee against subjugation dissolves the less enlightening doctrinal rubrics and links cases decided under the equal protection clause with those that vindicate the substantive liberty element of the due process clause." Tribe, *supra*, § 16–21, at 1517 n. 26. While the named thrust of Defendant's attack is that of substantive due process, cases addressing similar issues appear more often to rest on equal protection. *See* Rotunda & Nowak, *supra*, § 15.4, at 598; § 17.6, at 82–83; § 18.3, at 224.

{55} We therefore look at both substantive due process and equal protection guarantees, and do not attempt to resolve the issues here "by resort[ing] to . . . pigeonhole analysis." *M.L.B. v. S.L.J.*, 519 U.S. 102, 120, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (internal quotation marks and citation omitted); *see also Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 2477, 2482, 156 L.Ed.2d 508 (2003) (explaining that *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), which "invalidated a law prohibiting the distribution of contraceptives to unmarried persons[,] . . . was decided under the Equal Protection Clause, but with respect to unmarried persons, the Court went on to state the fundamental proposition that the law impaired the exercise of their personal rights" (citation omitted); and, further, stating that "[e]quality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects"); *M.L.B.*, 519 U.S. at 120, 117 S.Ct. 555 (analyzing denial of access to the judicial process as reflecting both due process and equal protection concerns because the "[d]ue process and equal protection principles converge" (internal quotation marks and citation omitted)); *United States Dep't of Agriculture v. Murry*, 413 U.S. 508, 513, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (holding unconstitutional over-inclusive legislation that rested on an "irrebuttable presumption often contrary to fact" thereby "lack[ing] critical ingredients of due process"); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (stating that "the concepts of equal protection and due process, both stemming from our Ameri-

can ideal of fairness, are not mutually exclusive").

{56} Finally, as to considerations of both due process and equal protection, classifications of persons can be analyzed to determine compatibility of the law with the substantive constitutional guarantees which are "fundamental ... to [our] system of government and inherent in the concept of liberty under the due process clause." Rotunda & Nowak, *supra*, § 18.40, at 794–95. Liberty rights can also "be considered as fundamental rights for the purposes of equal protection analysis." *Id.* at 795; *see also* Rotunda & Nowak, *supra*, § 18.42, at 806 (stating that laws limiting rights considered fundamental for purposes of reviewing classifications under the equal protection clause and rights in the Bill of Rights will be subjected to strict review under the due process and equal protection guarantees).

## B. SORNA's Potential Vulnerability—General Observations

{57} In its pursuit to protect New Mexico citizens from further sex offenses by convicted sex offenders, it appears that the Legislature assessed the risk of a repetitive offense, since it determined that "sex offenders pose a significant risk of recidivism." § 29–11A–2(A)(1) (1999). However, there exists no formal written legislative history in regard to this factual determination. SORNA does not indicate what the Legislature considered in making such a determination. Therefore, we do not know what was considered.

{58} With respect to registration and notification, the approach in SORNA, like that in sex offender laws in several other states, is labeled a "compulsory approach." In other words, registration is required and notification is triggered without any procedure for a prior hearing to determine existence or gradations of recidivism risk. *See* Logan, *supra*, at 1175; *Helman v. State*, 784 A.2d 1058,

1065 n. 2 (Del.Supr.Ct.2001) (listing nineteen states providing for compulsory registration). Balancing the risk of harm to citizens against the potential for harm to offenders who may be able to present evidence that they are not a likely recidivist or a current danger to society, SORNA represents a legislative choice to err on the side of protecting society. No slack exists with respect to sex offenders who might be able to present evidence that they do not "pose a significant risk of recidivism," § 29–11A–2(A)(1), or are "not likely to be currently dangerous." *Connecticut v. Doe*, 123 S.Ct. at 1164.

{59} Thus, SORNA provides no individualized risk-assessment hearing on the question of recidivism. Presumably, the unfairness to any who might present evidence that they do not pose a significant risk of recidivism is, in the Legislature's view, outweighed by the risk that citizens may be harmed notwithstanding such evidence. SORNA's message is that no chance should be taken, even were a sex offender able to present evidence in an individualized hearing that he or she is integrateable into society and neither a recidivist nor a current danger, since the risk of harm to society, no matter what the evidence, is still too great if exceptions were permitted, a risk the Legislature simply refuses to take.

{60} The New Mexico Appellate Public Defender, as Amicus Curiae,[3] indicates that Megan's Law "was enacted in a matter of weeks" after the occurrence of the sex offense against Megan and "was never subjected to any kind of scientific review, nor were the state and federal statutes that flowed from it." Amicus further states that several studies contradict those presented to Congress that "suggested that as a group, sex offenders are significantly more likely than other repeat offenders to re-offend with sexual or other violent crimes, ... that this tendency persists over time," and that "recidivism rates do not appreciably decline over time" with an offender's increasing age.[4]

---

**3.** We express our appreciation to the State Appellate Public Defender for its assistance as Amicus Curiae.

**4.** The studies cited by Amicus are: Symposium, *The Use of Social Science and Medicine in Sex Offender Commitment*, 23 New Eng. J. on Crim. & Civ. Confinement 347, 372 (1997) (citing stud-

ies); Jenny A. Montana, Note, *An Ineffective Weapon in the Fight Against Child Sexual Abuse: New Jersey's Megan's Law*, 3 J.L. & Pol'y 569, 590 (1995) (noting that predictions of dangerousness result in false-positives two-thirds of the time). The following are cited by Amicus under a *see generally* signal: R. Karl Hanson & Mo-

Amicus finds even more compelling articles that, according to Amicus, indicate "widespread disagreement over whether, in fact, sex offenders as a criminal sub-group manifest higher recidivism rates than other criminal actors."[5]

{61} The State argues in favor of the standard of review and scrutiny generally given to statutes under constitutional attack, which, the State contends, are that we "must give deference to the legislative findings and presume [SORNA] is constitutional." The State also relies on articles,[6] and in addition points to language in cases indicating that sex offenders are dangerous. *See, e.g., Smith v. Doe,* 123 S.Ct. at 1153 ("Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class."); *see also McKune v. Lile,* 536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) ("Sex offenders are a serious threat in this Nation."); *Kansas v. Hendricks,* 521 U.S. 346, 360 n. 3, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (recognizing that states are afforded wide latitude in assessing the risk posed by prior offenders and in fashioning laws designed to provide for public safety); *State v. Wilkinson,* 269 Kan. 603, 9 P.3d 1, 5–6 (2000) (stating that sex offenders are a "class of criminals who are likely to reoffend"). The Wisconsin Court of Appeals in *Radke* noted that "[a]lthough studies have come to varying conclusions, there is at least some evidence supporting the view that child sex

offenders, particularly those with prior convictions, have a high recidivist rate." 647 N.W.2d at 878 n. 8. The court set out various studies. *Id.* The court concluded:

> Despite the uncertainty in this area, based on the importance of the interest in protecting potential victims from sexual assault, we cannot conclude that the legislature acted irrationally when it chose to err on the side of protecting the public in lieu of permitting circuit courts to make individualized determinations regarding sentencing.

*Id.* At least one Megan's Law case has indicated what the factual bases likely are for the recidivism concerns and legislative determinations. *See Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 374–75 (1995) (setting out studies and statistics regarding recidivism).

{62} The crimes that trigger the notification provisions under SORNA are limited to (1) criminal sexual penetration (CSP) in the first or second degree, § 30–9–11; (2) criminal sexual contact of a minor in the third or fourth degree (CSCM), § 30–9–13; (3) sexual exploitation of children, § 30–6A–3(A)–(C); (4) sexual exploitation of children by prostitution, § 30–6A–4; and (5) attempt to commit any of the foregoing crimes, § 30–28–1. § 29–11A–5.1(A). Significantly, these criminal statutes all proscribe sexual conduct involving children: three do so exclusively, and CSP does in part, with the remainder of CSP proscribing heinous sexual criminal conduct. It is obvious that the Legislature carefully considered the crimes that should trigger the notification provisions and limited those

---

nique T. Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies,* 66 J. of Consult. & Clinical Psychol. 348, 357 (1998) (concluding, on basis of review of multiple empirical studies, that only thirteen percent of offenders committed new sex offenses within a four-to-five year follow-up period); Robert J. McGrath, *Sex-Offender Risk Assessment and Disposition Planning: A Review of Empirical and Clinical Findings,* 35 Int'l J. of Offender Therapy & Comp. Criminology 328, 331 (1995) (providing comprehensive review of studies revealing the difficulty of assessing likelihood of sex offender recidivism).

5. These articles cited by Amicus are: David P. Bryden & Roger C. Park, *"Other Crimes" Evidence in Sex Offense Cases,* 78 Minn. L.Rev. 529,

572–73 (1994) (stating that "no study has demonstrated that sex offenders have a consistently higher or lower recidivism rate than other major offenders"); Kirk Heilbrun et al., *Sexual Offending: Linking Assessment, Intervention and Decision Making,* 4 Psychol. Pub. Pol'y & L. 138, 139 (1998) (noting that "there is little consensus in the literature").

6. The State cites Lawrence A. Greenfeld, *Sex Offenses and Offenders, An Analysis of Data on Rape and Sexual Assault,* Bureau of Justice Statistics (1997) (NCJ 163392), available at *www.ncjrs.org.,* and Robert A. Prentky et al., *Child Sexual Molestation: Research Issues,* Nat'l Institute of Justice Research Report (1997) (NCJ 163390), also available at *www.ncjrs.org.*

crimes to outrageous sexual or sexually oriented conduct aimed at children and other outrageous sexual conduct accompanied by particularly heinous behavior.

{63} The State clearly has a legitimate and compelling interest to match the notification provisions with these crimes in the legislative attempt to minimize the risk of harm to society by those who pose a significant risk of recidivism. We therefore have no doubt, and Defendant does not contest, that the State's interest in attempting to protect society from convicted sex offenders *who pose a significant risk of recidivism* is both legitimate and compelling. "There is no doubt that preventing danger to the community is a legitimate regulatory goal." *Salerno*, 481 U.S. at 747, 107 S.Ct. 2095. There is also no doubt that "the [State's] regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Id.* at 748, 107 S.Ct. 2095.

{64} But with over-inclusiveness come questions of fairness and rationality. What if an individual offender is able to present evidence that he or she does not pose a significant risk of recidivism and is not a current danger to society? The difficult question posed is, while it may be eminently reasonable, fair, and rational to impose the notification requirements on a sex offender whom psychologists and society have little doubt will probably repeat the horrid conduct, what can be reasonable, fair, and rational about a notification process that, in effect, tells a community, through strong implication, that the convicted offender will likely repeat the offense if, in fact, the offender is not at all likely to recidivate? This nagging concern created by SORNA's compulsory approach triggers concerns of deprivation of *individual* liberty and impairment of the exercise of personal rights, as well as diminishment of the humane view that those who commit crimes and pay their debt to society and who are not considered a continuing or current danger to society should be allowed, if not encouraged, to integrate into society as lawful and productive citizens as opposed to being treated as lepers and ostracized from society.

{65} Laws passed by our Legislature in years past indicate this concern. The view that criminal offenders, including sex offenders, should be given the opportunity of rehabilitation through pursuit of employment is embedded in the following legislative finding contained in the Criminal Offender Employment Act, NMSA 1978, §§ 28–2–1 to –6 (1974, as amended through 1997) (COEA).

The legislature finds that the public is best protected when criminal offenders or ex-convicts are given the opportunity to secure employment or to engage in a lawful trade, occupation or profession and that barriers to such employment should be removed to make rehabilitation feasible.

§ 28–2–2. This finding "makes clear the legislative intent to encourage the rehabilitation of criminal offenders by removing barriers to their employment." *N.M. Bd. of Pharmacy v. Reece*, 100 N.M. 339, 341, 670 P.2d 950, 952 (1983). Indeed, one part of the COEA provides that "[c]ompletion of probation or parole supervision or expiration of a period of three years after final discharge or release from any term of imprisonment without any subsequent conviction shall create a presumption of sufficient rehabilitation for purposes [described in the COEA]." § 28–2–4(B).

{66} Another statute, the Caregivers Criminal History Screening Act, NMSA 1978, §§ 29–17–2 to –5 (1998, as amended through 1999), which restricts the employment of sex offenders as caregivers, § 29–17–5(D)(4), provides for an administrative hearing as to risk of harm and fitness for employment. § 29–17–5(F). This Act also reflects sensitivities to confidential information, making its disclosure a crime, § 29–17–5(I), and, sensitivities to privacy, prohibiting release of arrest record information. § 29–17–15(J).

{67} Although SORNA's registration and notification requirements primarily have a remedial purpose and effect, and constitute rational, reasonable protective devices, it nevertheless seems offensive to our traditional and fundamental concepts of individual justice and liberty to net an entire class of convicted persons, even sex offenders, in a broad sweep for long-term exposure to the

public as probable repeat sex offenders, giving none who can prove to be the exception any chance to escape. In that vein, we cannot help but note that, although the United States Supreme Court in *Smith v. Doe* had little problem determining that registration and notification were remedial and not punitive under an ex post facto analysis, in the recent case of *Lawrence*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508, it held sodomy proscriptions unconstitutional under the Fourteenth Amendment. The Supreme Court noted the adverse effect of sex offender registration in various states to which a sodomy conviction would subject persons convicted of sodomy, "underscor[ing] the consequential nature of the punishment and the state-sponsored condemnation attendant to the criminal prohibition." *Id.* at 2482.

{68} If we are to be vigilant in the protection of individual liberty, certainly we should have more than a passing concern when the effect of government action is to publicly brand a convicted person who has served out his sentence a current and continuing danger to society, one who will likely strike again. The gut concern is whether there exist some who should be given a fair opportunity to pursue their desire to live peaceably, pursue a livelihood, and enjoy the rights to pursue liberty, safety, and happiness, unhindered by continuing long-term active government compilation and dissemination of private identifying information. These declared rights include the right to protection of one's private life from unreasonable government intrusion: "[T]he right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled in part on other grounds by Katz v. United States*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The right to enjoy life and liberty, to acquire property, and to seek and obtain safety and happiness, are "natural, inherent and inalienable" rights under the New Mexico Constitution. N.M. Const. art. II, § 4.

"Of concern ... is any system of governmental information-gathering, information-preservation, and/or information-dissemination that threatens to leave individuals with insufficient control over who knows what about their lives. Such control must be understood as a basic part of the right to shape the "self" that one presents to the world, and on the basis of which the world in turn shapes one's existence. "Am I not what I am, to some degree in virtue of what others think and feel me to be?"

Tribe, *supra*, § 15–16, at 1389–90 (quoting I. Berlin, Four Essays on Liberty 155 (1969)) (footnote omitted).

{69} One's right to find work in common occupations must at the very least be considered an important one. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 103 n. 23, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." (internal quotation marks and citation omitted)); *Barsky v. Bd. of Regents*, 347 U.S. 442, 472, 74 S.Ct. 650, 98 L.Ed. 829 (1954) (Douglas, J., dissenting) ("The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property."); *State v. Spears*, 57 N.M. 400, 409–10, 259 P.2d 356, 362 (1953) (stating that "[t]he right of a citizen under our Constitution to follow any legitimate business, occupation, or calling which he may see fit to engage in, and to use such right as a means of livelihood, is fully secured" but still subject to reasonable regulation required for the public welfare); *see also Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 246–47, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (holding that the state deprived the petitioner of liberty without due process of law when, presumably based on concern of the risk of harm to society from communism, it denied him admission to the bar on a record which could not rationally justify a finding of unfitness to practice law).

{70} Furthermore, an important element of personal freedom must be the ability to change residences in a community or state without the government actively informing any and all where each new residence is

located. *Compare Corbin v. Chitwood,* 145 F.Supp.2d 92, 98 (D.Me.2001) (holding that under First Circuit case law, disclosure of one's home address does not warrant constitutional privacy protection), *with Doe v. Pryor,* 61 F.Supp.2d 1224, 1232 (M.D.Ala. 1999) (holding notification "law deprive[s] the plaintiff of a legitimate privacy interest in his home address," based on the view that "[t]he [sex offender] clearly has *some* privacy interest in the nondisclosure of his home address").

{71} In response to these concerns of limiting a person's ability to establish a private home and to earn a livelihood, of course, the compelling interest of public safety and the prerogative of the Legislature to establish a reasonable protective bright-line law must be carefully considered. Our Legislature has "broad latitude in experimenting with possible solutions to problems of vital local concern." *Whalen v. Roe,* 429 U.S. 589, 597, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). SORNA does not automatically fall merely because the Legislature did not lay out, or because the State has not presented, underlying ground work for the Legislature's recidivism finding. Nothing in the United States or New Mexico Constitutions proscribes legislative action merely because the Legislature's conclusions or assumptions are not underwritten by conclusive empirical or statistical data. *See id.* at 597–98 n. 21, 97 S.Ct. 869 (discussing constitutionality of state statutory patient identification security provisions based on underlying assumption of deterrent effect on potential violators). Like the United States Supreme Court, our New Mexico courts do not "require a legislature to articulate its reasons for enacting a statute." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). We acknowledge some "legislative need for approximation in choosing the means of serving" the ends sought. Tribe, *supra,* § 16–4, at 1446. A legislature's "resort to somewhat overinclusive classifications is legitimate as a prophylactic device to in-

sure the achievement of statutory ends." *Id.* at 1450.

{72} We in fact doubt the usefulness of weighing and balancing the plethora of contradictory and inconclusive legislative facts that can be offered by parties on the complex question of sex offender recidivism.[7] The question reduces simply to whether a particular convicted sex offender who faces the long-term dissemination of current residence and place of employment should be permitted to introduce personal psychological or other personalized scientific expert witness evaluations regarding recidivist proclivities and dangerous propensities in order to attempt to escape the notification provisions. This question is what creates an issue as to SORNA's vulnerability.

{73} With all the foregoing observations in mind, we move on to a discussion of Defendant's claims of a protected liberty interest and its abridgement. With respect to SORNA, we do so on a clean New Mexico slate. Defendant's reliance on *State v. Herbstman,* 1999–NMCA–014, 126 N.M. 683, 974 P.2d 177, which he suggests requires individualized sex offender assessment under SORNA, is misplaced. In *Herbstman,* the defendant pled guilty to criminal sexual penetration through force or coercion. *Id.* ¶ 3. If convicted, the defendant was required under SORA to register, and the court was required under SORA to give written notice to the defendant that he was required to register. *Id.* ¶¶ 6, 18; *see* § 29–11A–7 (1995). The district court entered a conditional discharge order. *Herbstman,* 1999–NMCA–014, ¶ 7, 126 N.M. 683, 974 P.2d 177. The defendant was placed on probation following a guilty plea but without an adjudication of guilt pursuant to our conditional discharge statute, NMSA 1978, § 31–20–13 (1994). *Herbstman,* 1999–NMCA–014, ¶¶ 1, 11, 126 N.M. 683, 974 P.2d 177. On appeal, the defendant argued that, in construing the conditional discharge statute and SORA, the defendant did not have to register as a sex offender under SORA. *Id.* ¶¶ 16–22.[8] The State argued that this result

---

7. For an excellent discussion of the use of legislative facts, see Justice Montgomery's dissent in *Trujillo v. City of Albuquerque,* 110 N.M. 621, 634–37, 798 P.2d 571, 584–87 (1990).

8. Following *Herbstman,* the Legislature amended Section 29–11A–7 (notice to sex offenders of duty to register) to substitute "convicted" for "adjudicated guilty."

would override the Legislature's finding that sex offenders pose a significant risk of recidivism to society. *Id.* ¶ 22.

{74} The district court in *Herbstman* was unpersuaded by the State's argument. The district court determined that the conditional discharge was not a "conviction" under SORA and, therefore, the court was not required to give notice to the defendant that he would have to register as a sex offender, determinations affirmed by this Court. *Id.* ¶¶ 5–7, 16–21. *In the context* of these determinations, the State argued on appeal that the Legislature's finding that sex offenders pose a significant risk of recidivism was a finding to which the district court must defer, forbidding the district court to grant the defendant a conditional discharge. *Id.* ¶ 22. Also, *within the same context,* this Court stated that:

> A reading of [SORA] indicates that the legislature knew that there would be persons having committed sex offenses who would not be required to register under [SORA]. The statute is prospective in application in that it only applies to those convicted after July 1, 1995. It is therefore clear that the legislature did not intend for every person who has committed a sex offense to be required to register as a sex offender.

*Id.* Defendant in the present case wants to take this statement out of its context—the context being persons who commit sex offenses but who are not considered as having been "convicted" (because they receive a conditional discharge) under SORA—to argue that the Legislature knew some sex offenders would not have to register because they could show they were not recidivists. The contextual gap is too great to bridge. In the context of the issues and arguments in *Herbstman,* this statement does not lead to or support a conclusion that Defendant has a substantive liberty right and a right to an individualized risk-assessment hearing. This was not an issue in *Herbstman. Herbstman* did not analyze the issue. It does not apply.

## C. Substantive Right and Restriction of the Right

{75} Defendant claims a liberty interest through both protected privacy and protected reputation interests. "[T]he phrase 'liberty interest' as used in the context of the Due Process Clause has not been fully delineated." *E.B. v. Verniero,* 119 F.3d 1077, 1106 n. 27 (1997).

### 1. Privacy Interest

{76} There is no "general constitutional 'right to privacy.'" *Whalen,* 429 U.S. at 607–08, 97 S.Ct. 869 (Stewart, J., concurring) (citation omitted). It is a "concept [that] still remains largely undefined." *Id.* at 599 n. 24, 97 S.Ct. 869. In *Whalen,* the United States Supreme Court described privacy as involving "at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." 429 U.S. at 598–600, 97 S.Ct. 869. The former interest has been characterized in federal circuit courts as the "confidentiality" strand of the right, and the latter interest as the "autonomy" strand of the right. *See, e.g., Shields v. Burge,* 874 F.2d 1201, 1209, 1210 (7th Cir.1989).

{77} The confidentiality aspect of the privacy interest has been spliced in the federal circuit courts into "the right to be free from the government disclosing private facts about its citizens and from the government inquiring into matters in which it does not have a legitimate and proper concern." *ACLU v. Mississippi,* 911 F.2d 1066, 1069–70 (5th Cir. 1990) (emphasis omitted) (quoting *Ramie v. City of Hedwig Vill.,* 765 F.2d 490, 492 (5th Cir.1985)); *Poritz,* 662 A.2d at 406. "[T]he existence of a right to privacy in personal information" appears to be "relatively well-established." *Paul P. v. Farmer,* 92 F.Supp.2d 410, 415 (D.N.J.2000). However, "the boundaries of that right are less clear." *Id.* The United States Supreme Court has not addressed the question of the propriety of government collection and public dissemination of private information in terms of a constitutional privacy right. Rotunda & Nowak, *supra,* § 18.30, at 662. *Whalen* went only as far as to say that the duty to avoid unwarranted disclosure of information collected "arguably has its roots in the Constitu-

tion." Rotunda & Nowak, *supra,* (quoting *Whalen,* 429 U.S. at 605, 97 S.Ct. 869).

### 2. Reputation Interest

{78} The combination of the registration and notification provisions in SORNA have a strong potential of resulting in damage to reputation. *See, e.g., Bd. of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (holding an employee's liberty interest would be implicated if dismissal were based on charges that "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"); *Wisconsin v. Constantineau,* 400 U.S. 433, 436–37, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (stating that it would be naive not to recognize that the public posting of a notice that characterizes an individual in a certain negative manner would "expose him to public embarrassment and ridicule," and holding a protectible liberty interest implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him"); *Valmonte v. Bane,* 18 F.3d 992, 1000 (2d Cir. 1994) (stating that the inclusion of a person on a list branded her as a child abuser, thereby "call[ing] into question her good name, reputation, honor, or integrity" (internal quotation marks and citation omitted)); *see also Poritz,* 662 A.2d at 419 (holding that public notification with respect to certain sex offender classifications "would expose plaintiff to public opprobrium, not only identifying him as a sex offender but also labelling [sic] him as potentially currently dangerous, and thereby undermining his reputation and standing in the community").

{79} The general parameters of due process deprivation in the context of a reputation interest were established by the United States Supreme Court in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The *Paul* Court stated generally that:

> [T]here exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of

the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.

*Id.* at 710–11, 96 S.Ct. 1155 (footnote omitted). However, the Court in *Paul* made it clear that although it can be reasonably argued that one's interest in reputation is a protected interest under state tort law, the alteration of reputation status by defamation does not result in a deprivation of any "liberty" interest—that is, "the interest in reputation ... is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." *Id.* at 712, 96 S.Ct. 1155; *see Hourigan v. Cassidy,* 2001–NMCA–085, ¶ 14, 131 N.M. 141, 33 P.3d 891 ("[G]enerally there is no constitutional claim for ... loss of reputation.") (citing *Paul,* 424 U.S. at 712, 96 S.Ct. 1155).

{80} In further elaboration, the Court in *Paul* indicated that more than injury to reputation interest is required to invoke procedural due process guarantees. More particularly, the State must have recognized a right or status beyond that of reputation alone, and such right or status, together with injury to reputation, must have been "distinctly altered or extinguished," or "officially remov[ed] ... from the recognition and protection previously afforded by the State." *Id.* at 711, 96 S.Ct. 1155. Courts have called this *Paul* requirement of an impairment of an interest recognized by states, in addition to mere damage to reputation, "stigma plus." *See Valmonte,* 18 F.3d at 999.

{81} In *Hourigan,* this Court recognized the concept of stigma plus in the context of a qualified immunity defense to a civil rights action under 42 U.S.C.A. § 1983. *See Hourigan,* 2001–NMCA–085, ¶ 14, 131 N.M. 141, 33 P.3d 891. We stated that "in addition to stigma ... there must be some evidence that the state sought to remove or significantly alter life, liberty, or property interests recognized and protected by state law." *Id.* (citing *Texas v. Thompson,* 70 F.3d 390, 392 (5th Cir.1995)). We recognized in *Hourigan* that "[t]he other legal interests have often been identified in terms of employment or busi-

ness relationships." *Id.* We held that evidence of actions of State Game and Fish Department employees to humiliate, intimidate, harass, and impinge the plaintiff's good name, where coupled with harm to an established, legitimate business interest or relationship, were sufficient assertions under *Paul* to establish a significant State alteration of a liberty interest recognized and protected under State law. *Hourigan,* 2001–NMCA–085, ¶¶ 14–15, 131 N.M. 141, 33 P.3d 891. New Mexico has not yet, however, addressed whether defamatory State action that reduces opportunities of prospective employment constitutes a "stigma plus" circumstance giving rise to impairment of a liberty interest.

{82} Cases outside New Mexico come to varying results. For those recognizing an assertable liberty interest, *compare Pryor,* 61 F.Supp.2d at 1232 (stating "[t]here can be little doubt that prospective employers and sellers or lessors of real estate will think twice before doing business with an individual deemed to be a likely recidivist and a danger to his community," and holding that to the extent employment and housing opportunities are foreclosed, the sex offender "will have satisfied the 'plus' part of the stigma-plus test"), *with Poritz,* 662 A.2d at 419 (concluding that the harm to one's reputation interest resulting from notification, when coupled with a concurrent incursion into one's protectible privacy interest grounded in the Fourteenth Amendment, is sufficient to create a protectible reputation interest, and that under the New Jersey Constitution, "a protectible interest in reputation [existed] without requiring any other tangible loss"). For those not recognizing an assertable liberty interest, *see, e.g., Cutshall v. Sundquist,* 193 F.3d 466, 479–80, 482 (6th Cir.1999) (holding interest in employment not to be a protected liberty or privacy interest); *Valmonte,* 18 F.3d at 1001 (interpreting *Paul* to exclude future employment as an additional circumstance since it was "included [within] the normal repercussions of a poor reputation").

### 3. The Similar Nature of the Privacy and Reputation Interests

{83} The interests at stake here are those concerned with and affected by the divulging and disseminating of personal, private, confidential information consisting of current residence and place of employment in a manner and under circumstances that give rise to a strong potential of long-term public stigmatization, humiliation, ostracism, and physical harassment, and of restriction of the ability to earn a living. While information as to residence is more a "privacy" issue, and information as to place of employment is more a "reputation" issue, the privacy and reputation interests merge to the extent that they each concern government dissemination of what the sex offender wants to keep private where the effect of the dissemination can be to substantially restrict the offender's ability to find a peaceful home in the community, to peaceably integrate into community life, and to earn a living. It defies common sense to deny that when the dissemination shows the way to a sex offender's home, the invasion of privacy can result in harassment, and that when the dissemination is defamatory, the breach of privacy can result in loss of employment opportunities.

{84} We conclude that the continuing, long-term government compilation and dissemination of one's current residence and current place of employment, under certain circumstances, can amount to a restriction of constitutionally protectable privacy and reputation interests and therefore an aspect of liberty under the United States and New Mexico Constitutions. As we have already stated in this opinion, the State has a legitimate and compelling reason to employ these informational safeguards to fulfill the State's duty to protect society from convicted sex offenders who pose a significant risk of recidivism. Such regulatory action is not arbitrary, oppressive, or unreasonable.

{85} These conclusions, however, do not end the inquiry. The issue still remains whether the notification provisions pass constitutional scrutiny even if an offender convicted of a notification-triggering sex offense can produce persuasive evidence showing that the offender does not pose a significant risk of recidivism and is not a current danger to society. In that limited context, we turn

to the standards of scrutiny that we give statutes that must pass through liberty interest due process and equal protection examination. For, no matter what arguments for or against restriction of individual liberty can be made, our analyses are circumscribed by the methods of constitutional scrutiny we are required to employ. In turn, the methods of constitutional scrutiny must be employed within the factual context of the nature of the private interest and the nature of the government interest.

{86} One of three standards of scrutiny is applicable. *Trujillo III*, 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305 (stating the three standards to be strict, intermediate, and rational basis). Which standard is employed depends in part on the character of the interest to be protected. "The extent to which the Court's scrutiny is heightened depends both on the nature of the interest and the degree to which it is infringed." Tribe, *supra*, § 16–33, at 1610; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 120, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (stating that the Court looks at the "intensity of the individual interest at stake," in considering the stake of a parent in the forced dissolution of her parental rights). The private interest at stake must be a fundamental one, or an important one, if scrutiny above rational basis scrutiny is to be employed.

{87} The focus here then becomes what type of constitutional scrutiny we are to invoke to test the State's justification for intrusion assuming the convicted offender can present evidence showing no potential for recidivism or dangerousness. For in the standards of scrutiny are found the tests by which we examine how restrictive the State can be in placing burdens on interests having

some level of protection under the due process and equal protection guarantees.

## D. Constitutional Scrutiny

{88} Our Supreme Court wrestled with constitutional scrutiny in damages cap cases. *See Trujillo III*, 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305; *Trujillo v. City of Albuquerque*, 110 N.M. 621, 798 P.2d 571 (1990) [hereinafter *Trujillo I*]; *Richardson v. Carnegie Library Rest., Inc.*, 107 N.M. 688, 763 P.2d 1153 (1988). The match concluded with *Trujillo III* settling on and defining the three standards of scrutiny. *Trujillo III*, 1998–NMSC–031, ¶¶ 14–16, 125 N.M. 721, 965 P.2d 305. We apply these standards "[i]n evaluating a due process or equal protection claim under the Federal or State [C]onstitutions." *Marrujo v. N.M. State Highway Transp. Dep't*, 118 N.M. 753, 757, 887 P.2d 747, 751 (1994).

### 1. Strict Scrutiny Is Not Required

{89} We employ strict scrutiny if a liberty interest exists which rises to the level of a fundamental right.[9] *Trujillo III*, 1998–NMSC–031, ¶ 16, 125 N.M. 721, 965 P.2d 305. "Challenged legislation garners strict scrutiny if it affects the exercise of a fundamental right or a suspect classification such as race or ancestry." *Id.* "A fundamental right is that which the Constitution explicitly or implicitly guarantees." *Richardson*, 107 N.M. at 696, 763 P.2d at 1161; *see Howell v. Heim*, 118 N.M. 500, 505–06, 882 P.2d 541, 546–47 (1994) (quoting *Richardson*, and holding asserted interest not to be a fundamental Article II, Section 18 right). The question is, do the interests here rise to the level of a fundamental right, a concept that "remains vague today." Rotunda & Nowak, *supra*, § 15.7, at 629.[10]

---

9. We are not concerned with the "suspect class" aspect of strict scrutiny. In *Richardson*, the Court reiterated the United States Supreme Court definition of a suspect class as "a discrete group 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" 107 N.M. at 696, 763 P.2d at 1161 (citation omitted). Convicted sex offenders do not comprise a "suspect class." Defendant has not argued that they do.

10. In their treatise, Rotunda and Nowak also conclude that "the standard of review [the Supreme Court] use[s] in fundamental rights cases is unclear." *Id.* § 15.4, at 604 (stating that the Court has often stated "that a law ... that impairs a fundamental right must be narrowly tailored to promote a compelling interest"); § 15.4, at 599 (noting that the Court has used the intermediate standard without formally adopting it); § 18.3, at 225 ("The Supreme Court has come close to stating ... it will use a balancing test or an intermediate form of review that would re-

{90} No United States Supreme Court case has addressed the nature of the specific interests that are involved in the present case and the involvement of government dissemination of truthful information for the protection of society, where, at the same time, the dissemination necessarily implies that the subject is a likely repeat sex offender when such implication is or may be incorrect and the effect will likely be harmful. In our search for meaningful decisional direction from the varied decisions of the United States Supreme Court relating to the privacy and reputation interests generally, and relating to the importance and intensity given to the nature of the particular right being exercised and restricted, we are unable to fit the interests asserted here into any category that has merited the application of strict scrutiny in privacy and reputation infringement review. Our independent analysis of the character of the interests at stake in this matter of first impression in New Mexico leads us to conclude that the interests do not rise to the level of a fundamental right. Several considerations underlie this ceiling on the status of the interests we are examining here.

{91} First, the United States Supreme Court has not expanded its view of an implied fundamental right to include the implied privacy interest Defendant claims has been burdened. Fundamental rights essentially have emanated from natural law concepts or very basic liberal (in the nineteenth century sense of the term) democratic concepts clearly essential to individual liberty in this Country in the view of a majority of Justices of the United States Supreme Court. *See* Rotunda & Nowak, *supra*, § 15.7, at 626–36. We have not found the interests asserted in this case to have their origin in natural law, nor have we found where the interests historically have been considered essential to constitutional democracy, as is, for example, the right to vote. *See Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (requiring close constitutional scrutiny when the right to vote is restricted); *Reynolds v. Sims*, 377 U.S. 533, 561–62, 84 S.Ct.

1362, 12 L.Ed.2d 506 (1964) (stating that "the right of suffrage is a fundamental matter in a free and democratic society"). From our review of Supreme Court cases on fundamental rights, as well as those on government dissemination of private, confidential information, we doubt the United States Supreme Court will go so far as to hold any interest asserted here to be a fundamental right. *Cf. Washington v. Rodriguez*, 82 N.M. 428, 431, 483 P.2d 309, 312 (Ct.App.1971) (refusing to extend right of privacy to prison inmate sodomy).

{92} Further, for the liberty interest to be a fundamental one, the interest must be one "traditionally protected by our society," or "rooted in history and tradition." *Michael H. v. Gerald D.*, 491 U.S. 110, 122–23, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); *but see Lawrence*, 123 S.Ct. at 2480 (making "[h]istory and tradition ... the starting point but not in all cases the ending point of the substantive due process inquiry" (internal quotation marks and citation omitted)). We have dug but not unearthed a clear historically- or traditionally-rooted interest in freedom from the government dissemination of information such that the interest should be denominated "fundamental."

{93} Second, although through very careful planning an individual might, in this society, still be able to keep his residence address and place of employment from unhindered citizen discovery, or at least be able to significantly minimize such discovery, the likelihood of success in doing so seems insubstantial. *See Paul P.*, 92 F.Supp.2d at 416 n. 4 (stating that persons can have only a low expectation of privacy with respect to their home addresses, and that "those seeking to hide their home addresses are a distinct minority"). In this information, information reporting, and Internet age, persons or groups interested in flushing the information out are likely to find it and can easily disseminate it. Thus, notwithstanding that the government's notification presents the sex offender as a like-

quire the government to demonstrate that the restriction on a fundamental right was substan-

tially related to an important interest.").

ly recidivist, a sex offender's expectation of privacy as to the information is significantly diminished. Based on the mood of society today in regard to sexual abuse, there undoubtedly exist a number of citizens who have a serious interest in knowing where convicted sex offenders live and work. In addition, a sex offender has no reasonable expectation that his conviction can be kept secret from a prospective employer. Government-facilitated public availability of a sex offender's conviction does not run afoul of constitutionally protected interests. Employers concerned about employees can check the conviction status of sex offenders as part of the hiring process.

{94} Third, we cannot divorce the private interest at stake from the class of individuals asserting the interest. The purpose for and process of information gathering and its dissemination relating to convicted sex offenders is significantly dissimilar to the disfavored proscription of, and prosecution for, the type of intimate family decisions and relationships, and of certain other consensual sexual adult relationships, the restriction of the privacy of which has been held unconstitutional. *See Lawrence,* 123 S.Ct. at 2484 (holding unconstitutional a statute making it a crime for two persons of the same sex to engage in private, intimate sexual activity); *Romer v. Evans,* 517 U.S. 620, 624–26, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating class-based legislation directed at homosexuals); *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (confirming that "[o]ur law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education"); *Roe v. Wade,* 410 U.S. 113, 170, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding unconstitutional certain restrictions on abortion as violating a woman's right to decide whether or not to terminate her pregnancy); *Eisenstadt v. Baird,* 405 U.S. 438, 443, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (invalidating a law prohibiting the distribution of contraceptives); *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (setting out various specific privacy interests and holding a statute forbidding use of contraceptives an unconstitutional intrusion on marital privacy); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (upholding the right of parents to direct the upbringing of their children).

{95} One convicted of a heinous sex offense starts a quest for constitutional protection from a much different and clearly less favorable position than those who to date have obtained privacy protection in the United States Supreme Court. *See* Tribe, *supra,* § 15–16, at 1397 (stating that the Supreme Court in *Paul* [424 U.S. at 713, 96 S.Ct. 1155] stressed that its "prior privacy decisions had related not to such matters as arrest records but rather to marriage, procreation, contraception, family relations, child rearing, or education"); *cf. Whalen,* 429 U.S. at 609, 97 S.Ct. 869 (Stewart, J., concurring) (stating that the ratio decidendi of *Griswold* supporting constitutional protection relating to marriage, privacy in the home, and the right to use contraceptives, "does not recognize a general interest in freedom from disclosure of private information"). In addition, the invasion of the privacy and reputation of a convicted sex offender results not from the direct proscription of very private decisions and relationships, but rather from an indirect and incomplete restriction of the offender's ability to live peaceably and earn a livelihood. Further, the concern about restrictions as to those convicted of criminally heinous acts harming non-consenting victims, often children, is simply not comparable to the protection of the privacy and dignity of those involved in the intimate decisions and relationships protected in Supreme Court cases. *See Lawrence,* 123 S.Ct. at 2484 (noting that the homosexual activity unconstitutionally proscribed by the state "[did] not involve minors … [or] persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused").

{96} A liberty interest is not absolute in the sense that no matter who exercises an aspect of it, what the nature of it is, or what degree of abridgement it confronts, the interest constitutes a fundamental right. Constitutional rights can receive greater or lesser degrees of protection, depending on

these circumstances. *See State ex rel. Stratton v. Sinks*, 106 N.M. 213, 216, 741 P.2d 435, 439 (Ct.App.1987) (distinguishing between the degree of First Amendment protection given to certain types of speech, stating that "[w]hile commercial speech is not excluded from first amendment considerations, it deserves a smaller degree of protection than noncommercial speech"). " 'Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' " *Arnold v. Bd. of Barber Exam'rs*, 45 N.M. 57, 67, 109 P.2d 779, 785 (1941) (quoting *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392, 57 S.Ct. 578, 81 L.Ed. 703).

### 2. Intermediate Scrutiny Is Not Required

{97} Citing several United States Supreme Court cases, the New Mexico Supreme Court describes intermediate scrutiny as "aimed at legislative classifications infringing important but not fundamental rights, and involving sensitive but not suspect classes." *Richardson*, 107 N.M. at 693, 763 P.2d at 1158; *see also Alvarez v. Chavez*, 118 N.M. 732, 736, 886 P.2d 461, 465 (Ct.App.1994) (discussing the United States Supreme Court's creation in *Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), of a level of scrutiny "falling somewhere between the extremes of strict scrutiny and rational basis," labeled intermediate scrutiny), *overruled on other grounds by Trujillo III*, 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305. If an important right is at stake, the intermediate scrutiny standard requires that the legislative classification be "substantially related to an important government interest." *Trujillo III*, 1998–NMSC–031, ¶ 15, 125 N.M. 721, 965 P.2d 305; *Pinnell v. Bd. of County Comm'rs*, 1999–NMCA–074, ¶ 27, 127 N.M. 452, 982 P.2d 503.

{98} Intermediate scrutiny is employed because it is considered "more sensitive to risks of injustice than the [rational basis standard] and yet less blind to the needs of government flexibility than [strict scrutiny]." *Richardson*, 107 N.M. at 698, 763 P.2d at 1163 (quoting Tribe, *supra*, § 16–32, at 1610) (emphasis omitted); *Marrujo*, 118 N.M. at 757, 887 P.2d at 751 (citing same). Thus, the door to intermediate scrutiny opens when the interest falls short of being a fundamental right, but involves an important right, certainly one more important and sensitive than rights restricted by primarily social and economic legislation. *See Trujillo III*, 1998–NMSC–031, ¶ 15, 125 N.M. 721, 965 P.2d 305. We think the interests asserted by Defendant here can be considered important ones.

{99} That said, however, the interest contemplated under intermediate scrutiny must involve, and has not in United States Supreme Court or New Mexico cases developed beyond involvement of, a "sensitive" class, which, thus far, is limited to gender and illegitimacy. *See id.; Marrujo*, 118 N.M. at 757, 887 P.2d at 751; *Richardson*, 107 N.M. at 693–94, 763 P.2d at 1158–59; *Pinnell*, 1999–NMCA–074, ¶ 27, 127 N.M. 452, 982 P.2d 503; Rotunda & Nowak, *supra*, § 18.3, at 223, § 18.19, at 514 (illegitimacy), § 18.23, at 549 (gender). Even assuming the interest at stake is an important one, intermediate scrutiny is not required in this case. The interest cannot fit into "sensitive" classification required to bring such scrutiny into play. Convicted sex offenders are clearly not the type of the sensitive class of persons for whom the United States Supreme Court or our New Mexico courts have engaged intermediate scrutiny. *Cf. Howell*, 118 N.M. at 506, 882 P.2d at 547 (stating that, "[w]hile the right to receive public assistance benefits is important, such right is a matter of statutory entitlement, and is not explicitly or implicitly guaranteed by the New Mexico Constitution" (citations omitted)).

{100} Further, even though an important right is at stake, we do not believe it appropriate to attempt a heightened scrutiny coverage, shift the burden of proof, and require the State to lay an adequate evidentiary foundation to support its restriction of the right. Federal courts have employed a heightened scrutiny that places the burden on the state to prove a substantial government interest and requires a narrow tailoring of the government restriction (such as, for example, an individualized hearing) in certain cases in which fundamental rights are not

involved. *See* Tribe, *supra*, § 16–32, at 1602–04. One such instance is when irrebuttable presumptions exist. *Id.* § 16–34, at 1618; *see also* Rotunda & Nowak, *supra*, § 18.3, at 222 n. 28 (noting the problems in applying standards or tests to governmental action regulating important areas of human activity that have not been declared fundamental rights). Tribe notes that the United States Supreme Court has used "a range of intermediate approaches ... when neither minimal nor strict review seems entirely appropriate," permitting consideration of "a variety of intermediate remedies." Tribe, *supra*, § 16–34, at 1618. "[T]he Court itself has not always been candid about its use of intermediate review." Tribe, *supra*, § 16–33, at 1610. This type of heightened scrutiny was introduced in *Richardson*, 107 N.M. at 694–98, 763 P.2d at 1159–63, and in *Trujillo I*, 110 N.M. at 623–24, 798 P.2d at 573–74, in order to address what our Supreme Court perceived was an important enough right to shift the burden to the State to justify the restriction on what the Court perceived was a Fourteenth Amendment right. However, the heightened scrutiny appears to have been rejected in *Trujillo III*, 1998–NMSC–031, ¶¶ 17, 19, 36–38, 125 N.M. 721, 965 P.2d 305, where the Court overruled "the intermediate scrutiny analysis adopted in *Richardson* and *Trujillo I*," primarily, it appears, because it was "unduly burdensome so as to be intolerable," and because "evidence issues posed substantial problems for the district courts."

### 3. Under Rational Basis Scrutiny, the Notification Requirements Survive

■ {101} When a fundamental right is not implicated, we must determine whether the statute is rationally related to a legitimate governmental purpose. *See Howell*, 118 N.M. at 505–06, 882 P.2d at 546–47; *Marrujo*, 118 N.M. at 757–58, 887 P.2d at 751–52 (stating that rational basis scrutiny applies when laws involve "personal activities that do not involve fundamental rights"); *Cummings v. X–Ray Assocs. of N.M., P.C.*, 1996–NMSC–035, ¶ 18, 121 N.M. 821, 918 P.2d 1321 (same, quoting *Marrujo* ); *see also Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (hold-

ing that asserted right to assistance in committing suicide is not a fundamental right, and that the constitution required that the state's "assisted-suicide ban be rationally related to legitimate government interests"); *In re J.W.*, 204 Ill.2d 50, 272 Ill.Dec. 561, 787 N.E.2d 747, 757 (2003) ("Where the statute does not affect a fundamental constitutional right, the test for determining whether the statute complies with substantive due process is the rational basis test."); *State v. Radke*, 256 Wis.2d 448, 647 N.W.2d 873, 877 (Wis.Ct. App.2002) (same); Rotunda & Nowak, *supra*, § 18.3, at 231 ("Today the Court employs the traditional rational basis test when the classification to be tested does not involve a fundamental right, and does not employ the characteristics of race, national origin, citizenship, sex or legitimacy of birth to define the benefited or burdened class.").

■ {102} Thus, under rational basis scrutiny, the classification must only be rationally related to a legitimate governmental interest. *Trujillo III*, 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305; *Pinnell*, 1999–NMCA–074, ¶ 29, 127 N.M. 452, 982 P.2d 503; *see also Mott v. Sun Country Garden Prods., Inc.*, 120 N.M. 261, 266, 901 P.2d 192, 197 (Ct.App.1995) ("To withstand substantive due process scrutiny, a statute need only bear some rational relationship to a legitimate legislative goal or purpose."). In making it clear that rational basis scrutiny is not a "toothless," "virtual rubber-stamp," as it had been so characterized in *Trujillo I* and *Richardson*, *Trujillo III* noted that the United States Supreme Court had used the rational basis standard to overturn legislation. *Trujillo III*, 1998–NMSC–031, ¶¶ 30–31, 125 N.M. 721, 965 P.2d 305; *see Lawrence*, 123 S.Ct. at 2484–85 (O'Connor, J., concurring) (discussing use of rational basis standard in Supreme Court cases); *Romer*, 517 U.S. at 635, 116 S.Ct. 1620 (holding, under a rational basis standard, a classification of homosexuals not to further a proper legislative end).

■ {103} We are unaware of any express retreat in the United States Supreme Court from the description of rational basis scrutiny in *McGowan v. Maryland*, 366 U.S.

420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961):

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

In *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), the Court continued this analytic approach, stating "[o]n rational basis review, a classification ... comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Id.* at 314–15, 113 S.Ct. 2096 (internal quotation marks and citations omitted); *see* Rotunda & Nowak, *supra*, § 18.3, at 231 ("The Justices [of the United States Supreme Court] will not review the reasonableness of laws tested under the rationality test. Even though the classification may seem unreasonable or unfair, a majority of the Justices will not strike the law so long as it is conceivable that the classification might promote a legitimate governmental interest.").

{104} Our Supreme Court cited *McGowan* when discussing the rational basis test. *See Trujillo III*, 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305; *Richardson*, 107 N.M. at 693, 763 P.2d at 1158. Indeed, in distinguishing between intermediate and rational basis scrutiny, the Court in *Richardson* stated that "under rational basis the party objecting to the legislative classification has the burden of demonstrating that the classification bears no rational relationship to a conceivable legislative purpose." *Id.* at 695, 763 P.2d at 1160. This Court cited *Beach Communications* in regard to the presumption of

statutory validity. *Pinnell*, 1999–NMCA–074, ¶¶ 29, 31, 127 N.M. 452, 982 P.2d 503. Furthermore, our Supreme Court has stated that to prove a legislative act unconstitutional under rational basis scrutiny, a party must "demonstrate that the challenged legislation is clearly arbitrary and unreasonable, not just that it is possibly so." *Richardson*, 107 N.M. at 693, 763 P.2d at 1158; *see* Rotunda & Nowak, *supra*, § 18.3, at 232 ("While some laws may fail [the rational basis scrutiny] test, in instances where a legislative entity has chosen to treat a classification of persons in a wholly arbitrary and invidious manner, there will be no independent judicial review of the factual basis for legislative decision making under this standard.").

{105} In addition, it is well settled in New Mexico that the courts "will not question the wisdom, policy, or justness of legislation enacted by our Legislature." *Madrid v. St. Joseph Hosp.*, 1996–NMSC–064, ¶ 10, 122 N.M. 524, 928 P.2d 250; *Espanola Hous. Auth. v. Atencio*, 90 N.M. 787, 788, 568 P.2d 1233, 1234 (1977) (same); *State ex rel. Hughes v. Cleveland*, 47 N.M. 230, 241, 141 P.2d 192, 199 (1943) (stating that in the exercise of its police power "it was for the Legislature to appraise the danger apprehended and to move to meet it," and that "[w]ithin constitutional bounds, the propriety, wisdom, necessity, utility and expediency of legislation are matters for its determination"). "It is but a decent respect due to the wisdom [and] the integrity ... of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt." *State ex rel. Lucero v. Marron*, 17 N.M. 304, 313, 128 P. 485, 488 (1912) (internal quotation marks and citation omitted). "A particular law is not rendered unreasonable or unconstitutional merely because its results are sometimes harsh." *Cummings*, 1996–NMSC–035, ¶ 38, 121 N.M. 821, 918 P.2d 1321.

{106} Along the same lines, "[a] determination of what is reasonably necessary for the preservation of the public health, safety and welfare of the general public is a legislative function and should not be interfered with, save in a clear case of abuse."

*State v. Collins,* 61 N.M. 184, 187, 297 P.2d 325, 327 (1956) (giving great weight and indulging every presumption in favor of validity of a statute through which the Legislature exercised its police power to safeguard the health, safety, and welfare of the public); *Sinks,* 106 N.M. at 217, 741 P.2d at 440 (holding State's interest in regulating pyramid scheme valid and in conformity with the State's primary obligation to protect the safety and welfare of the public, and concluding that "any infringement on first amendment rights is both negligible and subordinate").

{107} Finally, adding to the deference we give to legislative action, our case law firmly lays down the rule that the Legislature has broad discretion in determining necessary measures for the protection of the public. *See State v. Spears,* 57 N.M. 400, 410, 259 P.2d 356, 363 (1953) (stating, in connection with regulation of real estate brokerage through the police power of the State as to public welfare, and in connection with a State constitutional Article II, Section 18 attack, that "[a] large discretion is necessarily vested in the Legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests"); *Arnold,* 45 N.M. at 69, 109 P.2d at 787 (stating that the Legislature has "wide latitude . . . to determine the necessity for protecting the peace, health, safety, morals, and general welfare of the people"); *State v. Edgington,* 99 N.M. 715, 719, 663 P.2d 374, 378 (Ct.App.1983) (stating that under rational basis review the party attacking a statutory classification must show it "serves no valid governmental interest, is unreasonable and arbitrary as to amount to mere caprice").

■■■ {108} The State, without question, has a legitimate and compelling interest in protecting the public from sex offenders, and the notification provisions are unquestionably rationally related to that goal. We think it proper to defer to our Legislature's judgment as to a protective course of action in regard to persons convicted of the notification-triggering sex offenses. We will not, as long as rational basis is the scrutiny slot through which we review statutes, look be-

hind the Legislature's over-inclusive classification unless it "rests on grounds wholly irrelevant to the achievement of the State's objective," and, as long as "any state of facts reasonably may be conceived to justify it." *McGowan,* 366 U.S. at 425–26, 81 S.Ct. 1101. Nor can we say that the presumption of recidivism as to the notification-triggering crimes is wholly arbitrary. *Cf. Cummings,* 1996–NMSC–035, ¶ 40, 121 N.M. 821, 918 P.2d 1321 (upholding medical malpractice statute of repose because Legislature's solution was rationally related to solving a perceived problem, even though the solution was "to preclude almost all malpractice claims from being brought more than three years after the act of malpractice").

{109} We do not doubt that work and peaceable life in a community play an important role in our free society, and are generally not to be burdened with government closely looking over our shoulders and tracing our every step. However, although we think these are important interests, in the present circumstances, we also see these interests as much as factors in an individual's chances for economic and social success, development as a good citizen, and future participation in political and community life, which move the interests even more in tandem with the rational basis scrutiny. *Cf. Trujillo III,* 1998–NMSC–031, ¶ 28, 125 N.M. 721, 965 P.2d 305 (stating that the damages cap "attempt[ed] to regulate the burdens and benefits of economic life, and in doing so, [was] subject to rational basis scrutiny"); *Marrujo,* 118 N.M. at 757–58, 887 P.2d at 751–52 (stating that rational basis scrutiny applies in economic and social legislation, as well as personal activities that do not involve fundamental rights); *Richardson,* 107 N.M. at 692–93, 763 P.2d at 1157–58 (stating that "[t]raditionally, the United States Supreme Court long had employed . . . minimum scrutiny, or the rational basis test, when reviewing social and economic legislation"); *see also Lujan v. Colo. State Bd. of Educ.,* 649 P.2d 1005, 1018 (Colo.1982) (en banc) (refusing, in part for the same reasons, to elevate the right to public education to a fundamental right); *Edgington,* 99 N.M. at 718, 663 P.2d at 377 (following the holding in *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct.

1278, 36 L.Ed.2d 16 (1973), that education is not a fundamental right, and applying a rational basis standard in determining constitutionality of school attendance law). In considering the interests Defendant asserts in the present case under the strictures of constitutional scrutiny, we are not willing under Fourteenth Amendment analyses to consider placing those interests at the level of a fundamental right and, therefore, they are placed at a level requiring rational basis scrutiny.

{110} We are fully aware how this decision may impact the lives of those who are plainly not recidivists or a danger to society, although we suspect that will likely constitute relatively few. As to those individuals, it is at least arguable that constitutional scrutiny ought to require the burden to be on the State to show a substantial government interest, with concomitant factual support. There unquestionably has been a concern in the United States Supreme Court about employing rational basis scrutiny when the interest at stake is an important one and the legislation at hand is not simply social or economic in nature. *See* Rotunda & Nowak, *supra*, § 18.3, at 254 (discussing the United States Supreme Court's approach historically in regard to scrutiny and deference to legislative judgments, and suggesting "it is possible that the Court is moving towards converting the rationality test into a 'reasonableness' test similar to that employed during the 1900–1936 era"). Our Supreme Court appears to have attempted to meet this concern in *Richardson* and *Trujillo I* through a tweaked intermediate scrutiny standard, as noted earlier in this opinion.

{111} Further, this Court also attempted in *Alvarez*, 118 N.M. 732, 886 P.2d 461, and *Corn v. N.M. Educators Fed. Credit Union*, 119 N.M. 199, 889 P.2d 234 (Ct.App.1994), to adopt a new scrutiny standard. Between *Trujillo I* and *Trujillo III*, this Court in *Alvarez* adopted a "heightened rational-basis review" that, we felt, was consistent with the scrutiny standard developed in *Richardson* and *Trujillo I*. *Alvarez*, 118 N.M. at 738, 886 P.2d at 467. The standard used in *Richardson* and *Trujillo I* was purportedly in line with the United States Supreme Court's

heightened standard under which that Court would require the government to prove a substantial interest based on a "firm factual foundation." *Alvarez*, 118 N.M. at 738, 886 P.2d at 467 (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 458, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The heightened rational basis scrutiny adopted in *Alvarez* was different than the "traditional rational-basis review" in that under the traditional review "a statute will be upheld if there is any conceivable basis to support it whether or not that basis has a foundation in the record, whereas under the [heightened form], there must be either a factual foundation in the record to support the basis or a firm legal rationale to support the basis." *Corn*, 119 N.M. at 203–04, 889 P.2d at 238–39.

{112} *Trujillo III*, however, "expressly overrule[d] *Alvarez* and *Corn* to the extent that they adopt[ed] a fourth tier of review that ha[d] not been utilized in [New Mexico Supreme Court] cases." *Trujillo III*, 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305. Yet *Trujillo III* went on to state: "However, the rational basis test that we articulate today subsumes that fourth tier and addresses the concerns that caused the Court of Appeals to adopt a fourth tier of review." *Id.* We are unable to discern what our Supreme Court meant by this statement. Having overruled *Richardson*'s and *Trujillo I*'s intermediate scrutiny *analysis* that was based on the United States Supreme Court's heightened scrutiny, and having overruled *Alvarez*'s and *Corn*'s heightened rational basis scrutiny, the statement that "the rational basis test that we articulate today subsumes that fourth tier" makes the status of rational basis scrutiny in New Mexico less than clear, particularly because the only rational basis test "articulated" by our Supreme Court in *Trujillo III* is nothing more than the bare-bones traditional statement that the person attacking the statute has the burden to prove that "the statute's classification is not rationally related to the legislative goal." *Trujillo III*, 1998–NMSC–031, ¶ 14, 125 N.M. 721, 965 P.2d 305 (citing *Richardson*, which, as indicated in the text of the present opinion, cited *McGowan*). In rational basis scrutiny, "a legislative choice is

not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096. "[W]hen employing the rational-basis test, courts will not consider controversies surrounding the academic examination of legislative policy." *Cummings,* 1996–NMSC–035, ¶ 40, 121 N.M. 821, 918 P.2d 1321.

{113} Based on our full analysis of rational scrutiny, we conclude that the traditional rational basis standard is the standard we must use when strict and intermediate scrutiny are not required. Under that standard, we hold the SORNA notification provisions pass constitutional muster because they are rationally related to a legitimate governmental interest, purpose, and goal, and because Defendant has not sustained his burden to negative every conceivable basis that might reasonably support their use.

### E. The New Mexico Constitution

{114} Defendant did not, on appeal or below, discuss or request separate analyses or approaches under the New Mexico Constitution. *See State v. Gomez,* 1997–NMSC–006, ¶¶ 1–2, 12–24, 122 N.M. 777, 932 P.2d 1 (discussing requirements for preserving a State constitutional claim asserted beside a federal constitutional claim). More particularly, he has not asked us to interpret Article II, Section 18 of our Constitution to afford more protection than the Fourteenth Amendment or to require different constitutional scrutiny than that required as to claims based on the Fourteenth Amendment. We have therefore based our discussion and results in this opinion on the constitutional requirements and protections as those have developed or been limited by United States Supreme Court cases. *See State v. Coffin,* 1999–NMSC–038, ¶ 54 n. 2, 128 N.M. 192, 991 P.2d 477.

{115} Judge Bustamante's concurring opinion suggests that the result might be favorable to a defendant under a claim of violation of due process under the New Mexico Constitution with the concomitant request that greater protection be provided in regard to the defendant's liberty interest. It would

appear that, under a substantive due process analysis, for a New Mexico court to require a hearing on the issue of whether a defendant is likely to be a recidivist, *Trujillo III* will have to be distinguished or overruled. It would require reviving the heightened scrutiny that *Trujillo III* appears to have rejected, or adopting another variation of scrutiny such as that suggested by Justice O'Connor in her concurring opinion in *Lawrence,* 123 S.Ct. at 2486. Judge Bustamante's concurring opinion suggests adopting Justice Harlan's approach in his dissent in *Poe v. Ullman,* 367 U.S. 497, 540–55, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). While Justice Harlan eloquently expresses why the Fourteenth Amendment should protect the use of contraception by married persons and the giving of advice to married persons in contraception use, the essence of his dissent is that the liberty interests in question are fundamental rights because they involve "the most intimate details of the marital relation" within the home, and that strict scrutiny should be applied. *Id.* at 545–46, 548, 554, 81 S.Ct. 1752.

### F. Conclusion

{116} In sum, while the interests at stake can be viewed as important ones in the scrutiny context, they neither rise to the level of a fundamental right nor belong to a sensitive class requiring either strict or intermediate scrutiny. Furthermore, Defendant has not sustained his burden under rational basis scrutiny to constitutionally invalidate the notification provisions. Under the constraints of the scrutiny analyses we are required to employ, the SORNA notification provisions remain constitutional burdens on Defendant's rights.

{117} We are not without some concern regarding the harsh effects of notification on a convicted sex offender who can muster proof that he is not a likely recidivist and not a danger to society. However, once our scrutiny drops to rational basis scrutiny, we think it appropriate in the specific context of the notification-triggering crimes and the specific notification provisions in SORNA to defer to the Legislature's view of what is required to protect society from persons convicted of the

specific notification-triggering sex offenses. *See Marrujo*, 118 N.M. at 758, 887 P.2d at 752 (stating that, "[u]nderlying [the rational basis] standard is the traditional deference accorded by courts to the legislature's sense of 'the general good'" (internal quotation marks and citation omitted)).

{118} While our Legislature might have adopted a more discriminating scheme that would allow the attempted winnowing out of likely non-recidivists, we will not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

{119} Nor are we without some concern about the length of the period of notification. No doubt for some offenders, twenty years of difficulty in obtaining a desired livelihood, likely in addition to a prison sentence and parole, could be less a safety device than a device to keep a person close to the welfare rolls and to delay the offender's rehabilitation as a productive member of society. Perhaps at some early or mid-point an individualized hearing on recidivist tendencies might be a wiser course for society and a fairer consequence for an offender.

{120} Finally, in the present case, we have determined that the carefully chosen notification-triggering sex offenses pass rational basis scrutiny. However, nothing in this opinion is meant to suggest that government dissemination to the public of an individual's personal, private, and confidential information regarding convicted criminals cannot under certain circumstances be subject to successful constitutional attack.[11]

## VI. The Claim of Violation of the Contract Impairment Clause

 {121} In his reply brief only, Defendant asserts that application of the SORNA requirements violates the Contract Impairment Clauses of the United States and the New Mexico Constitutions, in that registration violates the terms of his binding plea agreement. *See* U.S. Const. art. I, § 10 ("No State shall ... pass any ... Law impairing the Obligation of Contracts."); N.M. Const. art. II, § 19 ("No ... law impairing the obligation of contracts shall be enacted by the legislature."). Based on his impaired contract contentions, Defendant seeks specific performance of the plea agreement.

 {122} Defendant's Contract Impairment Clause contentions are raised for the first time on appeal, and, on appeal, they were raised for the first time in his reply brief. We will not consider issues raised for the first time in an appellant's reply brief. *See State v. Fairweather*, 116 N.M. 456, 463, 863 P.2d 1077, 1084 (1993); *Hale v. Basin Motor Co.*, 110 N.M. 314, 321, 795 P.2d 1006, 1013 (1990); *see also* Rule 12–213(C) NMRA 2003 (requiring reply brief to be "directed only to new arguments or authorities presented in the answer brief"). Nor, generally, will we address issues not preserved below and raised for the first time on appeal. *See State v. Ware*, 118 N.M. 703, 705, 884 P.2d 1182, 1184 (Ct.App.1994) (declining to "address issues not raised in the trial court"). This Court will not address even constitutional issues if the issues were not raised in the district court, unless the issues involve matters of jurisdiction, fundamental error, or fundamental rights. Rule 12–216(A), (B) NMRA 2003 (providing that, except for questions involving jurisdiction, general public interest, fundamental error or fundamental rights of a party, "[t]o preserve a question

---

11. For example, we do not pass judgment on the question whether different notification-triggering crimes might cause the notification provisions to fail rational basis scrutiny. Some courts have. *See People v. Bell*, —— Misc.3d ——, —— N.Y.S.2d ——, 2003 WL 21649678 (N.Y.Sup.), 2003 N.Y. Slip Op. 23663, *7 (holding registration and notification requirements of New York sex offender law in violation of the substantive due process and equal protection guarantees, under rational basis scrutiny, reasoning that requiring registra-

tion for the crime of kidnapping a child, when absolutely no evidence that the offense committed was sexual in nature, could not pass the rational relationship test); *Raines v. State*, 805 So.2d 999, 1003 (Fla.Dist.Ct.App.2001) (holding unconstitutional under the equal protection clause as being over-inclusive a statute that defined as a sex offender a person convicted of false imprisonment with no concomitant sexual component).

for review it must appear that a ruling or decision by the district court was fairly invoked"); Rule 12–213(A)(4) (requiring appellant to explain in brief in chief how an issue was preserved below).

{123} Defendant does not ask us to review his constitutional claim under the Rule 12–216(B) exception to preservation for questions "involving ... fundamental error or fundamental rights." Properly so, because we see no basis for fundamental error or fundamental rights review on the issue here of impairment of contract.

## CONCLUSION

{124} We affirm on the issues of violations of the federal and State Ex Post Facto Clauses, of violations of the Due Process and Equal Protection Clauses, and of violation of Article IV, Section 34 of the New Mexico Constitution, and we also affirm on the issue of specific performance of the plea agreement. We do not reach the issue of impairment of contract under the federal and State Contract Impairment Clauses, for lack of preservation.

{125} **IT IS SO ORDERED.**

MICHAEL D. BUSTAMANTE, Judge (specially concurring).

CELIA FOY CASTILLO, Judge (specially concurring).

BUSTAMANTE, Judge (specially concurring).

{126} I concur in the opinion's resolution of Defendant's Ex Post Facto Clause theory and its analyses under Article IV, Section 34 of our State's Constitution. I also agree with the decision not to address Defendant's contract impairment argument on preservation grounds. Though I have reservations about the opinion's resolution of the due process claims, I feel compelled to concur and provide my own observations.

{127} As I understand it, Defendant's sole request is that he and other sex offenders be provided an opportunity to prove that they are not recidivists and that they will not offend in the future. One must be struck by the modesty of the request. Defendant does not argue that the Legislature may not enact SORNA with its full array of registration and notification provisions. He simply asserts that he should be allowed to try and prove that he is not an appropriate target of the regulatory and protective goals of SORNA.

{128} As noted by Amicus, one line of argument is apparently foreclosed to Defendant. In response to a strictly procedural challenge, the Supreme Court held that an offender subject to Connecticut's version of SORNA is not entitled to a hearing to prove he is not currently dangerous because that fact is "of no consequence under Connecticut's Megan's Law." *Connecticut Dep't of Pub. Safety v. Doe*, 123 S.Ct. at 1164. The Supreme Court specifically declined to consider whether the statute was vulnerable to a substantive due process challenge.

{129} *Connecticut v. Doe* is enigmatic in that it provides no explanation for its holding other than the observation that registration under Connecticut's statute is based solely on conviction for certain listed sexual offenses. The Court assumed arguendo that the defendant was deprived of a liberty interest but held that that fact did not entitle him to a hearing. This approach seems to be at odds with prior cases which direct procedural due process challenges to be examined in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted).

{130} The Supreme Court obviously did not apply this template in *Connecticut v. Doe*. Read broadly, this failure would call into question the continuing vitality of such venerable cases as *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (holding that failure to renew the employment of a nontenured public employee, in a manner injurious to his reputation, would constitute deprivation of liberty, thus requiring procedural due process), and *Jenkins v. McKeithen*, 395 U.S. 411, 424–25, 427–28, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (holding that commission which accusatory undertook function of publicly labeling per-

sons as criminal violators must grant such persons due process protection). Read even more broadly, the Supreme Court's decision could be seen as a wholesale devaluation of the value of process—that is, notice and a meaningful hearing—in our justice system.

{131} Fortunately, *Connecticut v. Doe* I think can be placed in the scheme of procedural due process law without dismantling it. In *Roth*, for example, the Court was dealing with actions taken against an individual who could theoretically prove the accusations against him wrong. In that circumstance the hearing would be about something of direct relevance to the harmful statements. In Megan's Law cases such as *Connecticut v. Doe*, on the other hand, the Court would be dealing with a legislative determination that conviction by itself merits registration and disclosure regardless of the circumstances of any individual. Thus, individual hearings cannot yield relevant information. In this very narrow sense, pure procedural due process can yield no remedy.

{132} *Connecticut v. Doe* left entirely open the possibility of a substantive due process challenge. I believe that a substantive analysis, probably under New Mexico's Constitution, can lead to a ruling that SORNA must provide for a hearing allowing offenders the opportunity to prove they are not recidivists and will not reoffend.

{133} In reaching this conclusion, I accept and need not embellish on the extraordinarily harsh consequences SORNA can have on sex offenders and, through them, their families. The opinion characterizes the liberty interests affected as important, but not fundamental. Given the United States Supreme Court's caution in recognizing fundamental liberty interests, I suspect the opinion mirrors the likely outcome when it decides the issue. That is why I do not dissent on the issue. In addition, rational review by the Supreme Court will probably lead to the same result we reach here.

{134} I see no reason, however, why the State of New Mexico could not apply an intermediate standard of review under the State Constitution in cases such as this: that is, where the liberty interest is strong and the remedy sought is simply an individual hearing. Adopting a variation of Justice Harlan's approach to substantive review as stated in his dissent in *Poe v. Ullman*, 367 U.S. 497, 549-55, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), would be a useful approach. Unfortunately, Defendant made no argument under our State Constitution.

{135} I predict that a case will present itself in which a showing can be made that applying SORNA will work undue hardship on a person who demonstrably does not present the danger which SORNA seeks to ameliorate. New Mexico courts will have the opportunity to take a fresh look at the problem then.

CASTILLO, Judge (specially concurring).

{136} I concur in all of Judge Sutin's opinion, except the inclusion of the equal protection analysis in Part V of the opinion. While I agree that the analyses for substantive due process and for equal protection are similar, Defendant did not brief the equal protection argument. Issues not briefed are not normally reviewed by the appellate court. *See City of Santa Fe v. Komis*, 114 N.M. 659, 665, 845 P.2d 753, 759 (1992). Further, the issues in this opinion can be decided without an equal protection analysis. Consequently, I specially concur to voice my concern about this portion of the opinion.